**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SCHYLA PONDEXTER-MOORE<br>741 Yuma Street SE<br>Washington, DC 20032 )<br><br>Plaintiff )<br><br>v. )<br><br>DISTRICT OF COLUMBIA HOUSING )<br>AUTHORITY, )<br>DISTRICT OF COLUMBIA, )<br>METROPOLITAN POLICE DEPARTMENT, )<br>DISTRICT OF COLUMBIA HOUSING )<br>AUTHORITY POLICE DEPARTMENT )<br>and HIGHLAND RESIDENTIAL LP )<br><br>Defendants. )<br><br>Serve: District of Columbia )<br>c/o Mayor Muriel Bowser )<br>1350 Pennsylvania Avenue NW )<br>Washington, DC 20004 )<br><br>Serve: District of Columbia Housing Authority )<br>c/o Executive Director Brenda Donald )<br>Serve: District of Columbia Housing Authority )<br>Police Department )<br>Serve: Highland Dwellings LP )<br>1133 North Capitol Street NE )<br>Washington, DC 20002 )<br><br>Serve: Metropolitan Police Department )<br>300 Indiana Avenue NW )<br>Washington, DC 20001 )<br>) | **Civil Action No. 2022-CV-03706**<br><br>**JURY TRIAL DEMANDED** |

## I.   INTRODUCTION

As soon as Schyla Pondexter-Moore ("Plaintiff" or "Ms. Pondexter-Moore") steps outside

her home, she knows she is being watched. When Ms. Pondexter-Moore moved into Highland

Dwellings, a public housing complex in Southeast D.C., more than fourteen years ago, she never expected to be arrested and forcibly removed from her apartment so her landlords could install surveillance cameras that would track her every move. This lawsuit challenges an unconstitutional surveillance network of over eighty cameras on nearly 200 homes set up by the District of Columbia Housing Authority ("DCHA"). This surveillance network constantly monitors the residents of Highland Dwellings and marshals the resources of the Metropolitan Police Department ("MPD") to break up lawful, innocuous associational activities.

Using the cameras' sophisticated capabilities, strategic locations, and ubiquity across the complex, the District of Columbia ("the District" or "D.C.") government engages in large-scale surveillance of the residents of Highland Dwellings. This surveillance results in a severe invasion of residents' privacy in their most sacred places: their homes and community. Each of the eighty cameras yields high-definition footage, can clearly render objects up to eighty feet away, and has infrared capability (i.e., "night vision"). Some of the cameras capture front entrances and windows of residential units. Some of the cameras require installation and a power current inside the apartment units to operate. Further, numerous cameras observe streets of Highland Dwellings, amounting to approximately one camera for every two-and-a-half Highland Dwellings homes. DCHA, MPD, and unidentified individuals can watch the residents' every move, day and night. Residents cannot escape the cameras' view as they move about the complex, from the moment they leave their homes until they walk at least a block away from the complex.

DCHA, in collaboration with MPD, maintains a massive surveillance program across public housing complexes, including Highland Dwellings, that gives the agencies access into the private lives of public housing residents at a level unimaginable through human observation alone. DCHA's Command Center boasts a main console controlling twelve 55-inch monitors, which

simultaneously stream live footage from 650 cameras. The footage can be saved for up to thirty days, allowing DCHA to maintain and review older events. By DCHA's own admission, it uses this footage to dispatch officers to break up even innocuous social activities like "dice games or things of that nature."[1]

Ms. Pondexter-Moore is a victim of disproportionate surveillance, degradation of rights, and invasion of privacy by the District. At every turn, Ms. Pondexter-Moore has been refused information about the cameras. DCHA installed the cameras without providing Ms. Pondexter-Moore with an adequate opportunity to be heard. Although Ms. Pondexter-Moore sought basic information about the cameras through public DCHA meetings and the proper grievance procedure, she has received no answers to this day. Instead, Defendants told her that she had no rights and no choice but to suffer this invasion of privacy in her own home.

Defendants' ongoing surveillance of Highland Dwellings constitutes a warrantless and unreasonable search of public housing residents. For Ms. Pondexter-Moore, the cameras at Highland Dwellings are also a constant reminder of Defendants' violation of her rights, the continuous invasion of her privacy, and the denial of her right to be heard. The lack of transparency around DCHA's massive surveillance effort invades residents' personal privacy and indicates the government's disregard for their constitutional and statutory rights as public housing residents.

## II.   JURISDICTION AND VENUE

1.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because they arise under the United States Constitution and federal civil-rights

---

[1] Brigette Squire, *Troublesome D.C. Neighborhoods Captured on Candid Camera*, WASH. INFORMER (May 12, 2021), https://www.washingtoninformer.com/troublesome-d-c-neighborhoods-captured-on-candid-camera/ [https://perma.cc/HJ6V-9XH3].

laws of the United States. Jurisdiction is also conferred by 42 U.S.C. § 1983 for violations of Plaintiff's rights under the United States Constitution.

2.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's claims under state and local laws because they are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

3.      Venue is proper under 28 U.S.C. §§ 1391(b)(1), (2) because Defendants are subject to the personal jurisdiction of this Court and a substantial part of the events giving rise to the claims occurred in the District of Columbia.

### III.     PARTIES

#### A.  Plaintiff

4.      Plaintiff Schyla Pondexter-Moore is an African American resident of the District of Columbia who lives with her son and daughter.

5.      Ms. Pondexter-Moore is a D.C. public housing resident of Highland Dwellings, located at 741 Yuma Street SE, Washington, D.C.,[2] and was a resident of Highland Dwellings during the relevant time period of the incidents herein.

6.      Ms. Pondexter-Moore has lived in public housing for over fourteen years.

#### B.  Defendants

7.      Defendant District of Columbia Housing Authority ("DCHA") is a public housing agency that provides affordable housing in the District of Columbia. Defendant owns and operates at least 8,000 apartments and townhomes at fifty-two public housing properties, including Highland Dwellings. DCHA either directly operates or contracts with a third-party management company to operate these properties.

---

[2] The complex spans over 14 acres and encompasses multiple street addresses, including 741 Yuma Street SE, 400 Atlantic Street SE, and 520 Atlantic Street SE.

8.      DCHA is primarily funded by the Department of Housing and Urban Development ("HUD") as a federal public housing agency and is subject to HUD's rules and regulations, including regulations requiring the implementation of grievance procedures for public housing tenants seeking to register complaints with those housing agencies.[3]

9.      The District of Columbia ("the District" or "D.C.") is a municipal corporation empowered to sue and be sued on behalf of itself and its subdivisions, including the Metropolitan Police Department ("MPD").[4]

10.      The District of Columbia Housing Authority Police Department ("DCHAPD") is a statutorily authorized police department established to provide protection to DCHA residents. Its jurisdiction is concurrent with MPD and co-extensive with the District's territorial boundaries.[5]

11.      Upon information and belief, Highland Dwellings is currently managed by Highland Residential LP ("HR"), a District of Columbia limited partnership corporation.

12.      Upon information and belief, Highland Residential LP is an affiliate of DCHA.

13.      DCHA and HR share the same address: 1133 North Capitol Street NE, Washington, DC 20002.

14.      During the relevant period and upon information and belief, Highland Residential LP worked in conjunction with DCHA to maintain and manage Highland Dwellings.

15.      At all relevant times, the camera company responsible for installing the camera equipment acted on behalf of DCHA.

---

[3] 24 C.F.R. § 966.5.

[4] D.C. Code § 1-102.

[5] D.C. Code § 6-223.

16.     At all times relevant to the facts herein, Defendants acted under color of District of Columbia law.

## IV.     FACTUAL ALLEGATIONS[6]

**A. DCHA Ignored Plaintiff's Rights by Installing Surveillance Equipment on Her Home Without Her Consent and an Adequate Opportunity to be Heard.**

17.     Defendants began installing security cameras and modifying the video surveillance system at Highland Dwellings in or around August 2017.

18.     On November 9, 2017, Ms. Pondexter-Moore received a first Notice of Intent to Enter from Defendant DCHA that stated a camera company would enter her home to install security cameras on November 16, 2017. [7]

19.     Following this first notice, and for several months thereafter, Defendant DCHA made multiple attempts to install a camera on Ms. Pondexter-Moore's home and a power box in her bedroom, while refusing to respond to Ms. Pondexter-Moore's repeated requests for basic information about the cameras' capabilities and purpose.

20.     The first Notice of Intent to Enter stated that the camera company would need to enter Ms. Pondexter-Moore's upstairs bedroom to install wiring for the outside of the building.[8]

21.     The Notice of Intent to Enter did not explain why installation inside the home, as opposed to outside of the home, was necessary, nor the exact function of the power box.[9]

---

[6] Unless otherwise indicated, the factual allegations are made upon reasonable knowledge, information and belief.

[7] *See* Exhibit A, Notice to Enter (Nov. 9, 2017).

[8] *Id.*

[9] *Id.*

22.     On November 16, 2017, the camera installation company, acting on behalf of Defendant DCHA, arrived at Ms. Pondexter-Moore's home and she refused to provide access to her upstairs bedroom. Defendant left without incident.

23.     On December 5, 2017, Ms. Pondexter-Moore received a second Notice of Intent to Enter from Defendant DCHA. It stated that the Defendant would enter her home within 48 to 72 hours, on either December 7 or December 8.[10]

24.     The Notice of Intent to Enter again stated that Defendant DCHA would need to access Ms. Pondexter-Moore's upstairs bedroom to install wiring for the outside of the building. This Notice of Intent to Enter specified that two power boxes, each with dimensions of 4 inches x 2 inches x 2 inches and reaching out 1.5 inches from the wall, would be installed in Ms. Pondexter-Moore's upstairs bedroom.

25.     Ms. Pondexter-Moore still did not have information about why installation inside of her home was necessary, or about the power box's capabilities.

26.     When Defendant DCHA attempted to enter Ms. Pondexter-Moore's home following the December 5 notice, she once again declined access.

27.     Following this refusal, Defendant DCHA served Ms. Pondexter-Moore with a thirty-day notice to vacate or cure in January 2018, an adverse action, for not allowing Defendant DCHA to enter her home to install equipment for the surveillance cameras in December 2017.

28.     On or about January 28, 2018, Defendants DCHA and HR began installing the power boxes for the camera outside of Ms. Pondexter-Moore's property without her knowledge or consent.

---

[10] *See* Exhibit B, Notice to Enter (Dec. 5, 2017).

29.     Ms. Pondexter-Moore approached the construction workers and asked them to stop installing the power boxes.

30.     In response to the thirty-day notice, Ms. Pondexter-Moore filed a complaint with the rental office at Highland Dwelling on January 30, 2018, in an attempt to gather more information about the cameras prior to their installation.

31.     Ms. Pondexter-Moore's grievance complied with Section 14-6301.3 of the D.C. Municipal Regulations, which permits a resident of DCHA housing who "believes that he or she is aggrieved, or adversely affected, by an act or failure to act by [a] DCHA official" to file an administrative complaint with DCHA's Central Office.[11]

32.     One day after Ms. Pondexter-Moore filed her complaint, on January 31, 2018, Defendants again came to Ms. Pondexter-Moore's home to install the cameras despite previously being asked to stop working on the power boxes because the security cameras and video surveillance systems were being challenged. Ms. Pondexter-Moore asked the construction worker completing the installation of the cameras to stop installing the cameras on the side of her home. She explained to the worker that she was still trying to obtain more information about the cameras and did not want the cameras installed until after she had communicated with DCHA and Highland Residential LP.

33.     Defendant DCHA had not yet responded to Ms. Pondexter-Moore's complaint at the time that its agent resumed installing the cameras.

34.     A DCHA police officer, Officer Mickey Green, approached Ms. Pondexter-Moore and the construction worker.

---

[11] D.C. Mun. Regs. tit. 14, § 6301.3 (2017).

35.     When Ms. Pondexter-Moore explained that she wanted more information about the camera before it was installed on her home, Officer Green loudly told Ms. Pondexter-Moore that she did not have any rights as a public housing resident and that she could not stop the worker from installing the cameras.

36.     Ms. Pondexter-Moore told Officer Green that she did have rights — rights that she had exercised the day prior.

37.     Officer Green responded to Ms. Pondexter-Moore with aggression, by using the full force of his body weight to restrain Ms. Pondexter-Moore against the exterior of the house.

38.     Officer Green is significantly heavier than Ms. Pondexter-Moore and violently overpowered her.

39.     Quite distressed, Ms. Pondexter-Moore began to plead with Officer Green not to touch her.

40.     In response to Ms. Pondexter-Moore's pleas, a crowd of residents formed around Ms. Pondexter-Moore and Officer Green.

41.     Ms. Pondexter-Moore's son heard his mother's pleas from inside the home, exited the apartment, and approached Ms. Pondexter-Moore and Officer Green.

42.     Ms. Pondexter-Moore's son pleaded with Officer Green to stop touching his mother.

43.     To Ms. Pondexter-Moore's horror, Officer Green slammed Ms. Pondexter-Moore's son against a wall.

44.     In front of the onlooking neighbors, Officer Green told Ms. Pondexter-Moore's son that he and his mother were going to jail.

45.     Ms. Pondexter-Moore was terrified that Officer Green was armed and that he could harm her and her son further. She called 911, told the operator that Officer Green was being aggressive, and asked for help.

46.     Ms. Pondexter-Moore's son eventually freed himself from Officer Green's grasp and went back into the home with Ms. Pondexter-Moore.

47.     Five minutes later, Ms. Pondexter-Moore heard banging on her door. When she opened the door, eight MPD police officers in riot gear awaited her. Two had battering rams, ready to knock down her door.

48.     The officers arrested Ms. Pondexter-Moore and her son.

49.     The combination of the harassment, assault, arrest, and transport to jail conducted by the officers constitutes one of the most horrifying experiences of Ms. Pondexter-Moore's life.

50.     The charges against Ms. Pondexter-Moore and her son were eventually dropped.

51.     While Ms. Pondexter-Moore and her son spent the night in jail, Defendants installed the camera and related equipment on the upper exterior wall of Ms. Pondexter-Moore's home.

**B.  Highly Sophisticated Surveillance Cameras Invade Plaintiff's Privacy By Constantly Monitoring Her Every Move Throughout Her Residential Community.**

52.     There are approximately eighty security cameras located within Highland Dwellings.

53.     The cameras are covered by circular domes.[12]

---

[12] *See* Exhibit E, Photograph of Highland Dwellings camera.

54.     Transmitters are attached to the top of long poles that are affixed to the sides of, and that extend above, the residential buildings.[13]

55.     Each camera is connected to one or two power boxes.

56.     The Highland Dwellings property covers about 14 acres.

57.     Exhibit D identifies the approximate location of about sixty visible cameras throughout the Highland Dwellings complex.[14]

58.     There is approximately one camera for every two-and-a-half Highland Dwellings homes.

59.     The majority of the public housing complex is visible and monitored by the security cameras.

60.     The cameras are installed on the side of people's homes.

61.     Some cameras are installed right next to residential windows.

62.     Two power boxes are installed on the outside of Ms. Pondexter-Moore's bedroom and their dimensions are 4 inches x 2 inches x 2 inches.

63.     The large number of cameras in such a small area creates a level of surveillance that is highly offensive in a residential context where residents are carrying out their personal daily routines, including, among other things: sleeping, eating, raising their children, gathering, and bathing.

   1.   ***The Cameras Have Advanced Capabilities.***

---

[13] *See* Exhibit C, Highland Dwellings photographs (April 2021).

[14] *See* Exhibit D, Highland Dwellings camera map (May 2021). This map was generated by the Georgetown Law Communications & Technology Law Clinic. Each red pin indicates a surveillance camera installed by DCHA.

64.    The cameras are manufactured by Dedicated Micros, a United States subsidiary of United Kingdom security company NetVu Ltd.

65.    Upon information and belief, Dedicated Micros' camera models have sophisticated features. The cameras create high quality video footage: at a minimum, the cameras have a 1280 x 720p high-definition resolution, they can auto-focus and zoom up to an estimated seventy feet, and they have infrared capabilities (i.e., "night vision") that allow the cameras to capture clear videos at night.

66.    The security cameras at DCHA, an independent government agency whose mission is to provide affordable housing, sustainable communities, and opportunities for life improvement to low-income individuals in the District of Columbia, have higher quality video footage than the CCTV network cameras at MPD, the primary law enforcement agency for the District of Columbia.

67.    Given the cameras' advanced remote-focus capabilities, Defendants DCHA, DCHAPD, and MPD can use the remote point-and-tilt zoom features of the cameras near the entrances of Highland Dwellings units.

68.    The security cameras' constant surveillance, high-quality images, and advanced technological features enable them to capture intimate details about Ms. Pondexter-Moore's life and movements that would otherwise remain private information.

69.    Security cameras at Highland Dwellings can observe both public and private spaces.

70.    It is impossible to know the entire scope of what the cameras can view because Defendants refuse to tell Highland Dwellings residents, including Ms. Pondexter-Moore, about the cameras' capabilities.

71.     However, the security cameras clearly capture a view of the front entrance of Ms. Pondexter-Moore's and other public housing residents' homes.

72.     Given the cameras' zoom capabilities, the cameras can render footage from within Ms. Pondexter-Moore's apartment unless her windows are covered.

73.     Ms. Pondexter-Moore has windows exposing, at a minimum, her bedroom, bathroom, and living room.

74.     At a minimum, DCHA's video surveillance system can map Ms. Pondexter-Moore's every movement within and near Highland Dwellings.

75.     MPD failed to respond to multiple Freedom of Information Act requests filed nearly two years ago, in October 2020, by the Georgetown University Law Center's Communications and Technology Law Clinic that requested information regarding the cameras' purpose, usage, and capabilities.

76.     DCHA's response to the Freedom of Information Act request filed by the Georgetown University Law Center's Communications and Technology Law Clinic did not provide any information responsive to the request regarding surveillance camera records.

   **2.   *The Cameras are Part of a Surveillance Network across Public Housing Complexes and are Used to Monitor Everyday Activities of Residents.***

77.     DCHA uses its vast camera network to constantly surveil residents, invading their privacy and subjecting them to an unjustifiably high level of law enforcement activity.

78.     DCHA has a "Command Center" located at DCHA's headquarters at 1133 North Capitol Street NE. One of DCHA's departments is the District of Columbia Housing Authority Police Department ("DCHAPD"), which is also known as the DCHA Office of Public Safety ("OPS").

79.    DCHAPD is a fully operational, 24-hour police force that covers fixed security stations and conducts police patrols throughout the city's public housing developments.

80.    DCHA's Command Center uses cameras to assist DCHAPD in surveilling public housing complexes.

81.    DCHA's Command Center features a console controlling twelve 55-inch monitors streaming live images from 650 cameras.

82.    Upon information and belief, this Command Center's video system stores data for at least thirty days and can play back the older footage stored in the system.

83.    The camera footage can be viewed on a cellphone, iPad, or PC from anywhere in the country or world.[15]

84.    The retrospective quality of this stored data provides Defendants with access to otherwise unknowable information.

85.    As of May 2021, DCHA's surveillance scheme applied to only some public housing properties.

86.    DCHA and DCHAPD do not appear to limit their use of the footage to investigative purposes, such as verifying the chronology or details of events after they have occurred.

87.    DCHA's Chief of Police and Director of Public Safety, Joel Maupin, directly acknowledged that DCHA uses the camera footage to preemptively monitor innocuous, lawful conduct. [16]

---

[15]  *DCHA Board of Commissioners Meeting,* Board of Commissioners at 20 (2020) (statement of Tyrone Garrett, Executive Director, DCHA), available at https://www.dchousing.org/docs/33wlevh5954.pdf.

[16] Squire, *supra* note 1.

88.     Additionally, staff stationed at headquarters monitor housing complexes and alert MPD and DCHAPD if they view activity such as loitering or street gambling.

89.     Specifically, according to Chief Maupin, DCHAPD uses DCHA camera footage to dispatch officers to break up "dice games or things of that nature" based on a belief that such activities "precede violence."[17]

90.     Using camera footage, DCHA can also identify individuals and arrest or ban them from the area.[18]

91.     DCHAPD also regularly works alongside MPD to patrol and assist in their investigations.[19]

92.     Additionally, DCHA uses its cameras to work with other federal agencies to monitor public housing properties.

93.     Upon information and belief, DCHA provides MPD and the D.C. Office of the Attorney General with information regarding all of the high-definition security cameras located on its properties, including the invoices, brand, serial numbers, and specific locations for each camera.

---

[17] *Id.*

[18] *Id.* A non-resident may be banned from DCHA property in a "bar notice," which can remain in effect for up to five years and can lead to the arrest of an individual found to be in violation of the bar notice. D.C. Mun. Regs. tit. 14, § 9600.

[19] MPD also provides information and assistance to DCHA. In 2017, Defendants entered into a Memorandum of Understanding ("MOU") agreement with MPD. The MOU gives DCHA access to MPD's Criminal Justice Information System, which contains data from multiple federal and local criminal justice agencies. Metropolitan Police Department, Memorandum of Understanding between Metropolitan Police Department and DC Housing Authority at 2 (March 2017), http://www.dchousing.org/docs/pjbzirji507.pdf  [https://perma.cc/MG9F-RV9J];  CJCC  Justice Information  System  (JUSTIS),  https://cjcc.dc.gov/page/cjcc-justice-information-system-justis [https://perma.cc/F88P-TZCL].

94.     DCHA has over 4,000 cameras connected via a web-based system that MPD has constant access to.[20]

95.     Highland Dwellings is one of many DCHA properties that makes remote, electronic access to its high-definition security camera footage available to MPD without requiring a warrant.[21]

96.     Highland Dwellings property manager Lori Baker informed Ms. Pondexter-Moore that the DCHAPD, MPD, and other unspecified individuals would be watching the footage from the cameras.

97.     MPD uses the CCTV network as part of its operations.

98.     DCHA's cameras monitor a vast variety of areas within and around the public housing complexes.

99.     DCHA's provision of footage to MPD has allowed MPD to expand the scope and quality of its surveillance across D.C.

100.    DCHA uses its cameras to allocate DCHAPD patrols.

101.    DCHA allocates patrols to areas with high crime statistics.

102.    In March 2021, DCHA used its Command Center to make 47 arrests on 113 charges.[22]

103.    In April 2021, DCHA used its Command Center to make 31 arrests on 61 charges.[23]

---

[20] *DCHA Board of Commissioners Meeting*, *supra* note 15, at 21-22, 33.

[21] *See District of Columbia v. District of Columbia Housing Authority*, Consent Judgment and Order, Civ. No. 2020-CA-002740-B at 2 (Sept. 10, 2020), https://oag.dc.gov/sites/default/files/2020-09/DCHA-Consent-Order.pdf [https://perma.cc/5GNE-WUX4].

[22] *See* Squire, *supra* note 1.

[23] *See id.*

104.    In March and April 2021, DCHA used its cameras to remove approximately 15 firearms and related ammunition.

105.    In March or April 2021, DCHA assisted the U.S. Marshals Service in an arrest.

106.    DCHA's close coverage of public housing communities gives MPD the ability to remotely engage both CCTV and DCHA security cameras to have almost complete, and potentially overlapping, security camera footage of the Highland Dwellings area and the movements and activities of Highland Dwellings residents.

107.    Enabling Highland Dwellings' security cameras in tandem with MPD's CCTV network likely allows Defendants to collect intimate details and/or otherwise private information on public housing residents like Ms. Pondexter-Moore.

108.    MPD disseminates camera footage from Highland Dwellings on YouTube, where it can be viewed by the public, when it is investigating suspected criminal activity.[24]

## C. DCHA Failed to Follow Proper Regulations and Breached Plaintiff's Lease Agreement When It Installed the Camera Surreptitiously and Without Consent.

109.    Ms. Pondexter-Moore's arrest and detention in jail was the culmination of her months-long effort to seek more information about and challenge the installation of the cameras through internal DCHA grievance procedures.

110.    DCHA failed to follow procedures required by the D.C. Code, federal regulations, a binding settlement agreement, and general custom when installing the cameras around Highland Dwellings.

---

[24] Metropolitan Police Department, *Person of Interest in ADW (Gun), 800 b/o Yuma St, SE, on September 28, 2018*, YOUTUBE, https://www.youtube.com/watch?v=BDZdBBoTC3A (last visited Oct. 18, 2022).

111.    When a DCHA property implements a change, D.C. Municipal Regulation 14 § 6002 requires DCHA to provide tenants notice and an opportunity to comment on actions that change a tenant's lease and consider those comments before implementing the change.[25]

112.    Federal regulation 24 C.F.R. § 966.5 requires that local housing authorities give tenants written notice and the opportunity to comment for any modifications on rules and regulations that are incorporated into the lease.

113.    The DCHA standard lease requires DCHA to give a tenant notice for any change in the grievance procedure, community living standards, and any DCHA policy which would be incorporated into the lease.

114.    Highland Dwellings' management by a private entity does not affect, circumscribe, or otherwise alter Ms. Pondexter-Moore's rights.

115.    Ms. Pondexter-Moore and a group of fellow residents negotiated a settlement agreement (the "Settlement Agreement") with DCHA in 2012 to ensure that Highland Dwellings residents would maintain their same rights as public housing residents, despite the property's transition to being managed by a private contractor.

116.    The Settlement Agreement specifies, in part, that "there will be no difference between the rights of Residents in the units designated as 'public housing' and the rights of Residents in the units. . . at Highland Dwellings" and "Residents will have the same rights to file grievances."[26]

---

[25] *See* D.C. Mun. Regs. tit. 14, § 6002.3.

[26] Final Settlement Agreement at 5, *Highland Dwellings Together We Stand Legal Action et. al vs. District of Columbia Housing Authority*, 2011 CA 001349B (D.C. Superior Court Oct. 8, 2012).

117.    When examined together, the Settlement Agreement, landlord and DCHA practice, local regulations,[27] and Ms. Pondexter-Moore's lease all support Ms. Pondexter-Moore's reasonable expectation that she will have the opportunity for notice and comment for any significant change to her home and living conditions.

118.    Even though Ms. Pondexter-Moore filed an administrative complaint regarding the installation of the cameras, as allowed by Section 14-6301.3 of the D.C. Municipal Regulations, Defendant DCHA attempted to install the cameras on Ms. Pondexter-Moore's home shortly after the complaint was filed, while refusing to respond to her complaint or provide her with the requested information.

119.    Ms. Pondexter-Moore's complaint stated: "I was served a 30-day notice because I do not have sufficient information as to how the decision was made to install 80+ cameras in our community. Specifically on our homes. I am challenging the process and decision about the cameras. We don't have ANY info about them. I did NOT want them entering my home to install."[28]

120.    Defendant failed to follow the procedures required by the D.C. Code and D.C.'s Municipal Regulations, 24 C.F.R. § 966 and D.C. Municipal Register Title 14, § 6300, *et seq*.

121.    First, Defendant did not schedule an informal meeting with Ms. Pondexter-Moore within three business days of her filing her complaint as required by § 6302.1.

122.    Second, Defendant still had not responded to Ms. Pondexter-Moore's complaint when it resumed installing the cameras and has not provided her with any response to this day. Despite Ms. Pondexter-Moore's repeated requests, Defendants have still failed to provide any

---

[27] *See* 24 C.F.R. § 966.5; D.C. Mun. Regs. tit. 14, § 6002.

[28] Exhibit F, Plaintiff's Original Complaint to DCHA, (Jan. 30, 2018) (emphasis in original).

information regarding the surveillance cameras located on her home and throughout Highland Dwellings.

123.    Defendants' decision to install cameras at Highland Dwellings is a significant change that would require DCHA to notify residents and give them an opportunity to comment on the change at a DCHA Commissioners meeting or property meeting.[29]

124.    Ms. Pondexter-Moore has never received information about the installation and usage of the security cameras and video surveillance systems at Highland Dwellings. Specifically, Ms. Pondexter-Moore has never been notified of the duration of the cameras' deployment, their general capabilities, what is in view of the cameras, who has access to the live camera feeds or recorded footage, and how the cameras are used.

125.    Highland Dwellings normally has monthly property meetings. These meetings provide an opportunity for residents to ask questions to the property manager, Lori Baker, and receive information about situations occurring on or at the property. Lori Baker was an employee of Highland Dwellings LP.

126.    Distressed about how the cameras were being used, Ms. Pondexter-Moore attempted to receive information about the security cameras and video surveillance systems during monthly property meetings.

127.    Defendant DCHA failed to hold DCHA Board of Commissioners meetings or property meetings open for public comment during September or October of 2017, when the cameras were being installed.

---

[29] D.C. Mun. Regs. tit. 14, § 6002.3.

128.     Ms. Baker eventually held a property meeting in November of 2017. Because Ms. Pondexter-Moore was worried about the pervasive surveillance of Highland Dwellings, she attended the meeting to learn more information about the cameras.

129.     Ms. Pondexter-Moore asked questions regarding the installation and usage of the security cameras and video surveillance systems at Highland Dwellings. She asked the property manager about who has access to the cameras, why there are so many cameras, who is funding the cameras, whether there was a vote or resolution passed from DCHA's board to approve these cameras, who approved the installation of the cameras, and why the cameras were necessary.

130.     Ms. Baker did not answer Ms. Pondexter-Moore's questions. Instead, Ms. Baker told Ms. Pondexter-Moore that she had no choice and had to allow the installation.

131.     Specifically, Ms. Baker did not answer why the installation of the cameras was necessary, who had access, or any of Ms. Pondexter-Moore's other questions.

132.     The property meetings and DCHA Commissioners meetings held by Defendants are residents' only avenues to challenge DCHA policies.

133.     Because DCHA Commissioners did not meet during the installation of the cameras and Ms. Baker refused to give her sufficient information, Ms. Pondexter-Moore has not had a meaningful opportunity to be heard.

**D. Constant Surveillance Negatively Impacts Plaintiff's Quality of Life.**

134.     Ms. Pondexter-Moore and the residents of Highland Dwellings have the right to participate fully in the economic, cultural, and intellectual life of the District and should not have their freedom to participate in all aspects of life, including housing, restricted by constant, intrusive surveillance.

135.    The cameras at Highland Dwellings negatively impact residents' quality of life in their homes.

136.    Each time Ms. Pondexter-Moore walks around Highland Dwellings or enters her home, Ms. Pondexter-Moore is watched by multiple cameras.

137.    Ms. Pondexter-Moore's movements inside her home are monitored by the surveillance cameras that are facing her windows.

138.    Being constantly surveilled without sufficient information about the cameras, or an opportunity for her input, makes Ms. Pondexter-Moore feel like "less than a citizen" in terms of her rights.

139.    The cameras interrupted Ms. Pondexter-Moore's sleep every night for approximately one year, as she could hear the noise of the cameras turning from her bedroom in the middle of the night.

140.    Ms. Pondexter-Moore still experiences sleep deprivation as a result of concerns about constant surveillance.

141.    The negative experiences of Ms. Pondexter-Moore are the direct result of the Defendants' policy, practice, and custom of operating security cameras and video surveillance systems in D.C. public housing sites.

142.    The events before, during, and after the installation of the cameras caused Ms. Pondexter-Moore significant suffering and pain.

143.    Ms. Pondexter-Moore is aware of the cameras every time she leaves her home.

144.    Ms. Pondexter-Moore is aware of the cameras every time she looks out her window.

145.    Ms. Pondexter-Moore was aware of the cameras every time she heard them from within her home.

146.    Ms. Pondexter-Moore was extremely distressed, humiliated, and embarrassed from the altercation with Officer Green, the arrest, and spending one night in jail.

147.    The cameras constantly remind her of the traumatic experience of being harassed by Officer Green and of enduring one night in jail.

148.    The cameras constantly remind her of being arrested in front of her neighbors.

149.    DCHA and Highland Dwellings made an example out of Ms. Pondexter-Moore: if residents speak up and ask questions, they will be silenced and met with a show of force.

150.    Defendants' failure to communicate with residents about the installation and the purpose of the cameras is extremely distressing to Ms. Pondexter-Moore.

151.    Ms. Pondexter-Moore experiences continued emotional distress, mental anguish, embarrassment, humiliation, and disrupted sleep from Defendants' actions.

## V.    CLAIMS

### First Claim for Relief Against All Defendants

### Illegal Ongoing Search Inside Plaintiff's Home

*Fourth Amendment to the United States Constitution*

152.    Plaintiff adopts and incorporates paragraphs 1 through 151 above as if fully set forth herein.

153.    At all times relevant to the facts described herein, DCHA was acting within its scope of authority conferred by the District of Columbia.[30]

154.    At all times relevant to this case, DCHAPD was acting within its scope of authority conferred by the District of Columbia.[31]

---

[30] *See* D.C. Code § 6-203.

[31] *See* D.C. Code § 6–223.

155.    At all times relevant to this case, Highland Residential LP acted under the color of state law.

156.    At all times relevant to this case, MPD was acting within its scope of authority conferred by the District of Columbia.[32]

157.    Acting under color of state law, Defendants have violated, and continue to violate, the rights of Plaintiff under the Fourth Amendment.

158.    Plaintiff has an actual, subjective expectation of privacy in her home.

159.    Through their sophisticated capabilities and strategic locations, the cameras capture a view of Plaintiff's home that is not visible to the general public and give Defendants access to otherwise unknowable information.

160.    The cameras can render footage through the Plaintiff's windows of private acts conducted in the Plaintiff's bedroom, bathroom, and living room.

161.    DCHA's cameras are high definition.

162.    At a minimum, the cameras have a 1280x720p resolution.

163.    The cameras have infrared capabilities that allow the cameras to capture clear video in a low-light, nighttime setting beyond the human eye's capacity.

164.    The cameras can auto-focus and zoom up to seventy feet, enhancing visibility beyond that of a human eye.

165.    Defendants can use the remote point-and-tilt zoom features of the cameras to view objects as far as 70 feet away from the camera as if they were close in distance.

166.    The cameras are positioned in vantage points outside of the building that are not accessible to people and thus capture images that the human eye cannot see from ground level.

---

[32] *See generally* D.C. Code § 5-101-33.

167.     Defendants' video surveillance system stores data for at least thirty days, creating an exact record of Plaintiff's home and activities.

168.     In general, the home has historically been protected as a special domain of personal privacy in American society under the Fourth Amendment.

169.     Highland Dwellings has been Plaintiff's home for over fourteen years.

170.     Plaintiff does not abdicate her Fourth Amendment right to privacy by living in public housing owned by Defendant DCHA.

171.     Plaintiff's subjective expectation of privacy inside her home is one that society is prepared to recognize as objectively reasonable.

172.     Allowing Defendants to access and monitor Highland Dwellings' security cameras constitutes a warrantless search violating Plaintiff's subjective and objective expectations of privacy.

173.     Defendants' actions cause Plaintiff to suffer emotional distress and sleep deprivation.

### Second Claim for Relief Against All Defendants

### Illegal Ongoing Search of Plaintiff's Movements

*Fourth Amendment to the United States Constitution*

174.     Plaintiff adopts and incorporates paragraphs 1 through 173 above as if fully set forth herein.

175.     Plaintiff has an actual, subjective expectation of privacy in the whole of her physical movements.

176.     Plaintiff's expectation of privacy includes not having every step taken around her home and residential community recorded.

177. Defendants' massive surveillance program captures a map of Plaintiff's movement around the complex in a way that is not possible with human observation.

178. There are over eighty cameras at the complex.

179. Cameras are located strategically to monitor all areas within and surrounding the complex.

180. There is not only one camera recording residents when they leave their house, but also cameras around the property that can capture residents' movements throughout the entire complex.

181. The cameras also capture when residents leave the complex and their direction of travel.

182. The footage from the cameras at Highland Dwellings contains unique information not accessible to a passerby on the street.

183. The average person has access to one view at a time, not several different angles.

184. Defendants store footage from the cameras for thirty days.

185. The human brain cannot maintain a clear memory for thirty days.

186. Residential communities have historically been sacred places in American society under the Fourth Amendment's protections.

187. Highland Dwellings has been Plaintiff's home for over fourteen years.

188. Plaintiff does not abdicate her Fourth Amendment right to privacy by living in public housing owned by Defendant DCHA.

189. Plaintiff's subjective expectation of privacy in the whole of her movements is one that society is prepared to recognize as objectively reasonable.

190.    Defendants' actions cause Plaintiff to suffer emotional distress and sleep deprivation.

## Third Claim for Relief Against All Defendants

### Invasion of Privacy

*Common Law of the District of Columbia*

191.    Plaintiff adopts and incorporates paragraphs 1 through 190 above as if fully set forth herein.

192.    At all times relevant to this case, employees of Highland Dwellings acted within the scope of their employment by Defendants DCHA and Highland Residential LP.

193.    This claim arises from the continuous and ongoing surveillance of Highland Dwellings, which represents an intrusion on seclusion under the Common Law of the District of Columbia.

194.    Defendants' use of surveillance cameras is an unlawful invasion of Plaintiff's privacy.

195.    Video surveillance constitutes an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination.

196.    Defendants intentionally installed the cameras to intrude on Plaintiff's privacy.

197.    Video surveillance constitutes an "invasion" and an "investigation."

198.    The home is a place of seclusion protected by the invasion of privacy tort.

199.    Given the sophisticated capabilities of the cameras and their strategic locations, the cameras can likely view inside Plaintiff's home, her place of seclusion.

200.     The surveillance camera system at Highland Dwellings would be highly offensive to an ordinary, reasonable person because it disrupts the feelings of privacy and safety that people are entitled to in their own home.

201.     The sophisticated capabilities, strategic locations, and large number of the surveillance cameras give Defendants a unique and detailed look into the lives of Highland Dwellings residents inside their homes and constitute a level of surveillance that is both highly offensive and unacceptable.

202.     The infrared capabilities of the cameras enable round-the-clock, perpetual surveillance of Plaintiff's home.

203.     Cameras can zoom in to capture detailed footage of the inside of Plaintiff's home, including private acts conducted in the Plaintiff's bedroom, bathroom, and living room.

204.     Defendants' invasion of privacy causes Plaintiff severe emotional distress and embarrassment.

## Fourth Claim for Relief Against All Defendants

### Violation of Procedural Due Process

*Fifth and Fourteenth Amendments to the United States Constitution*

205.     Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 204 above.

206.     Plaintiff has a right to procedural due process under the Fifth and Fourteenth Amendments of the United States Constitution.

207.     Because public housing has been recognized as a property interest protected by due process, Plaintiff has a protected property interest in her continued tenancy at her public housing unit at Highland Dwellings, where she has lived for over thirteen years.

208.    DCHA's standard lease; Plaintiff's settlement agreement with DCHA; 24 C.F.R.
§ 966.5 and D.C. Mun. Reg. tit. 14 § 60002; and the custom and policy of Defendants DCHA and
Highland Dwellings all provide notice and opportunity for residents' comment on significant
changes to their property.

209.    Taken together, the above policies create an expectation that Plaintiff will not be
deprived of her right to maintain the integrity of her home without due process.

210.    Therefore, Plaintiff has a protected property interest in her right to maintain the
integrity of her home at Highland Dwellings. This protected property interest guards against
changes to her property—like the installation of surveillance cameras—without due process.

211.    Plaintiff's property interest in her continued tenancy and in her right to maintain
the integrity of her home is of high importance because public housing is considered a necessity.

212.    Plaintiff has a protected liberty interest in her right to freedom of movement.

213.    Plaintiff has a liberty interest in her personal identifying information.

214.    Plaintiff's liberty interests in her right to freedom of movement and in her personal
identifying information are of high importance.

215.    Additionally, the surveillance cameras themselves and their large power boxes are
a physical intrusion on Plaintiff's property that violates her protected property interest.

216.    Highland Residential LP, acting under the color of state law, DCHA, acting within
the scope of its authority under D.C. Code § 6-203, and Highland Dwellings employees, acting
under the scope of their employment by Highland Residential LP and DCHA, installed cameras
around Plaintiff's home at Highland Dwellings without adhering to the proper procedural
safeguards.

217.    All Defendants continue to conduct constant surveillance of the property.

218.    Defendants did not adequately notify Plaintiff about the installation of the cameras, did not provide sufficient information about the cameras and their capabilities to Plaintiff, and did not give Plaintiff an opportunity to comment about the cameras when they failed to hold any DCHA Board of Commissioners or property meetings during the period of installation.

219.    To this date, Defendants have not provided Plaintiff with an opportunity to comment, nor have Defendants provided her information about the duration of the cameras' deployment, their general capabilities, what is in view of the cameras, who has access to the live camera feeds or recorded footage, and how the cameras are used.

220.    The constant and pervasive surveillance of Plaintiff's home at Highland Dwellings continuously deprives Plaintiff of her property and liberty interests and she has not been afforded adequate procedural protections.

### Fifth Claim for Relief Against All Defendants

#### Violation of Substantive Due Process

*Fifth and Fourteenth Amendments to the United States Constitution*

221.    Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 220 above.

222.    Plaintiff has the right to preserve the privacy of her home.

223.    Plaintiff has the right to raise a family free from government surveillance.

224.    The Due Process Clause of the Fifth and Fourteenth Amendments provides heightened protection against government interference with such fundamental rights and liberties.

225.    Defendant Highland Residential LP, acting under the color of state law, Defendant DCHA, acting within the scope of its authority under D.C. Code § 6-203, and Defendants' agents,

acting under the scope of their employment by Highland Residential LP and DCHA, installed cameras around Plaintiff's home at Highland Dwellings without her consent.

226.    All Defendants continue to engage in constant surveillance of the property, depriving Plaintiff of her substantive due process rights.

### Sixth Claim for Relief Against All Defendants

**Violation of Right to Freedom of Association**

*First Amendment to the United States Constitution*

227.    Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 226 above.

228.    Plaintiff has the right to freedom of association under the First Amendment of the United States Constitution.

229.    Because Highland Residential LP acted under the color of state law, DCHA acted within the scope of its authority under D.C. Code § 6-203, and Highland Dwellings employees acted under the scope of their employment by Highland Residential LP and DCHA, the installation of surveillance cameras around Plaintiff's home is a government action that curtails her right to association and is thus subject to strict scrutiny.

230.    Upon information and belief, the cameras installed around Highland Dwellings are a part of a broader effort by DCHA to increase surveillance capabilities at public housing properties throughout the District of Columbia.

231.    Upon information and belief, DCHA coordinates with MPD and other federal agencies in their surveillance efforts.

232.    The cameras are used to not only monitor access routes through properties (roads, sidewalks, entries and exits, etc.) but also to observe the dwelling units themselves.

233.   Upon information and belief, the cameras at Highland Dwellings likely transmit live footage back to a command center that is monitored by DCHA employees in collaboration with MPD.

234.   These surveillance efforts often target relatively harmless activities like loitering or dice games. These efforts can often culminate in the identification of individuals who are subsequently arrested or banned from properties entirely.

235.   Due to the presence of the surveillance cameras, Plaintiff does not feel comfortable hosting gatherings and inviting guests over to her home.

236.   Plaintiff stopped hosting associational meetings about tenant's rights and social justice initiatives at her home, in part, due to fears of constant surveillance.

## VI.   DAMAGES

237.   Plaintiff has suffered the following injuries for which she seeks full compensation under the law:

238.   Emotional distress and humiliation from pervasive surveillance.

239.   Emotional distress and stress from being denied information about the cameras and surveillance system.

240.   Disrupted sleep from the constant presence of the cameras.

## VII.   PRAYER FOR RELIEF

Plaintiff respectfully asks the Court:

(a) ENTER JUDGMENT holding the Defendants jointly and severally liable to Plaintiff for compensatory damages and other damages recoverable under the common law of the District of Columbia in the amount that the court sees fit;

(b) ORDER Defendants to remove the surveillance cameras on the Highland Dwellings property;

(c) ORDER Defendants to hold meetings with residents at Highland Dwellings to provide a full and detailed explanation of the purpose of the surveillance cameras, their technical capabilities, the extent to which the cameras can see inside residents' homes, who has access to footage, and how the footage is used;

(d) ORDER Defendants to implement procedures, including notice and opportunity to be heard, prior to taking action in Highland Dwellings that affects the residents' privacy, including any changes to the purpose of the surveillance cameras, their technical capabilities, the extent to which the cameras can see inside residents' homes, who has access to footage, and how the footage is used;

(e) ORDER Defendants to follow existing procedures regarding public comment for any changes to D.C. public housing complexes affecting residents' privacy, including the installation of surveillance cameras;

(f) AWARD Plaintiff her costs and reasonable attorney's fees; and

(g) GRANT such other and further relief as the Court deems just and proper.


Dated: December 12, 2022                                    Respectfully submitted,

                                                           */s/Aderson Francois*
                                                           Aderson Francois (DC Bar #498544)
                                                           Civil Rights Clinic
                                                           Georgetown University Law Center
                                                           600 New Jersey Avenue NW
                                                           Washington, DC 20001
                                                           (202) 662-6721
                                                           aderson.francois@georgetown.edu

                                                           *Attorney for Plaintiff*

**PLAINTIFF'S EXHIBIT A**
(Notice of Intent to Enter served on Plaintiff on November 9, 2017)

**Notice of Intent to Enter Nov. 2017**

**Notice of Intent to Enter**

November 9, 2017

To:    741 Yuma

On **Thursday, November 16, 2017** between the hours of 9am-4:45pm, the camera company will be in your UPSTAIRS BEDROOM to install wiring for the outside of the building. It will take a few hours to complete.

**Please be prepared to have a tech in your home, upstairs,  as early as 9am.**

Although it is not necessary for you to be home, please note that if you are not home, management will let them into your home.

If you have any questions, please do not hesitate to call the management office at 202-750-8353.

Sincerely,

Ms. Barker, SCMR, BOS, T4CO, COS
Community Manager
Highland Residential, LP

**PLAINTIFF'S EXHIBIT B**
(Notice of Intent to Enter served on Plaintiff on December 5, 2017)



**Notice of Intent to Enter Dec. 2017**

December 5, 2017

To:   741 Yuma St., SE

On Thursday, December 7, 2017 & Friday, December 8 between the hours of 9am-4:45pm, the camera company will be in your **UPSTAIRS BEDROOM** to install wiring for the outside of the building. It will take a few hours to complete.   The box is the size of your outlet on that wall.  It will be a box that reaches out about 1.5 inch on the wall.   The dimensions are: 4 inches x 2 inches x 2 inches. There will be 2 of these boxes along with casing that will match the wall color.   See attached picture.

**Please be prepared to have a tech in your home, upstairs, as early as 9am.**

Although it is not necessary for you to be home, please note that if you are not home, management will let them into your home.

If you have any questions, please do not hesitate to call the management office at 202-750-8353.

Sincerely,

Ms. Barker, SCHM, BOS, TaCCs, CGS
Community Manager
Highland Residential, LP

**PLAINTIFF'S EXHIBIT C**
(Photograph of transmitters above Highland Dwellings buildings)



**PLAINTIFF'S EXHIBIT D**
(Map of camera locations at Highland Dwellings)

### Highland Dwellings Map



**PLAINTIFF'S EXHIBIT E**
(Photograph of Highland Dwellings camera showing brand name Dedicated Micros)



\

**PLAINTIFF'S EXHIBIT F**

(Complaint filed with DCHA by Plaintiff on January 30, 2018)

---

District of Columbia Housing Authority
1133 North Capitol Street, Northeast
Washington, D.C. 20002-7599

**COMPLAINT**

Name: Schyla Pandeytr-Ucave    Phone No.: 20-204-7592    Soc. Sec. No.: 577923868

Property: Highland Dwellings    Address: 741 Yuma St SE    Zip Code: 20032

Lease No.:    Complaint No.:

☐ Tenant and Signatory to DCHA Lease      ☐ Applicant

**A. Description of Complaint:** I was served a 30 day notice because I do not have sufficient information as to how the decision was made to install 80+ cameras in our community. Specifically on our homes. I am challenging the process and decision about the cameras. We don't have ANY info about them. I did NOT want them onto my home to install.

**B. This Complaint is based on the following action/inaction by DCHA:**

30 day notice

**C. Where known, name of DCHA employee who took (or failed to take) action:**

CIH, Lori Parker

**D. I request DCHA to take the following action:**

Rescind the 30 day notice. Remove equipment from my home. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

☐ I choose to deliver this complaint to the DCHA Central Office.

☑ I choose to deliver this complaint to the Management Office of: Highland Dwellings

Signature of Complainant      Date

☑ Written Complaint      ☐ Oral Complaint: Data above completed by DCHA staff

**Please Do Not Write Below This Line**

Employee Receiving Complaint:

Patrick Naya      1/30/18
Signature      Date

White: Legal    Yellow: Tenant/Applicant    Pink: Tenant/Applicant File    Goldenrod: Regional/Central Office

DCHA-1
(4/96)