**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| | ) | |
| SCHYLA PONDEXTER-MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-3706 (RBW) |
| | ) | |
| DISTRICT OF COLUMBIA | ) | |
| HOUSING AUTHORITY, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**<u>MEMORANDUM OPINION</u>**

The plaintiff, Schyla Pondexter-Moore, brings this civil action against the District of

Columbia Housing Authority (the "DCHA"), the District of Columbia Housing Authority Police

Department (the "DCHAPD"), and Highland Residential LP (collectively, the "defendants"),[1]

pursuant to 42 U.S.C. § 1983, alleging violations of the Fourth Amendment to the Constitution,

<u>see</u> Complaint ("Compl.") ¶¶ 152–90, ECF No. 1; District of Columbia common law, <u>see</u> <u>id.</u>

¶¶ 191–204; the Fifth and Fourteenth Amendments to the Constitution, <u>see</u> <u>id.</u> ¶¶ 205–26;[2] and

the First Amendment to the Constitution, <u>see</u> <u>id.</u> ¶¶ 227–36.  Currently pending before the Court

are (1) the defendants' motion to dismiss the plaintiff's Complaint pursuant to Federal Rule of

---

[1] On January 30, 2025, the Court granted defendants District of Columbia and Metropolitan Police Department's separate motion to dismiss, to the extent that it sought to dismiss the plaintiff's claims against defendant Metropolitan Police Department.  <u>See</u> Order at 1 (Jan. 30, 2025), ECF No. 54.  And, on March 7, 2025, the Court granted the remaining component of that motion to dismiss and dismissed the plaintiff's claims against defendant District of Columbia.  <u>See</u> Order at 1 (Mar. 7, 2025), ECF No. 57; <u>Pondexter-Moore v. District of Columbia</u>, No. 22-cv-3706 (RBW), 2025 WL 740455 (D.D.C. Mar. 7, 2025).

[2] Although the Complaint purports to bring claims pursuant to the Fourteenth Amendment, it is well-settled that "[t]he Fourteenth Amendment is not applicable to the District of Columbia[,]" <u>Bullock v. Washington</u>, 468 F.2d 1096, 1100 n.9 (D.C. Cir. 1972) (citing <u>Bolling v. Sharpe</u>, 347 U.S. 497, 499 (1953)), and therefore the plaintiff's due process claims can proceed only under the Fifth Amendment.

Civil Procedure 12(b)(6), see Defendants District of Columbia and Highland Residential LP's

Motion to Dismiss ("Defs.' Mot.") at 1, ECF No. 27; and (2) the defendants' supplemental

motion to dismiss the plaintiff's Complaint pursuant to Rule 12(b)(1), see Defendants District of

Columbia and Highland Residential LP's Supplemental Motion to Dismiss Under 12(b)(1)

("Defs.' Suppl. Mot.") at 1, ECF No. 74. Upon careful consideration of the parties'

submissions,[3] the Court concludes for the following reasons that it must grant in part and deny in

part both the defendants' supplemental motion to dismiss pursuant to Rule 12(b)(1) and the

defendants' motion to dismiss pursuant to Rule 12(b)(6).

## I.    BACKGROUND

### A.    Factual Background

The following allegations are derived from the plaintiff's Complaint, unless otherwise

specified. The plaintiff is "an African American resident of the District of Columbia who lives

with her son and daughter." Compl. ¶ 4. The plaintiff is "a [ ] public housing resident of

Highland Dwellings . . . and was a resident of Highland Dwellings during the relevant time

period of the incidents [at issue in the Complaint]." Id. ¶ 5. The DCHA "owns and operates at

least 8,000 apartments and townhomes at fifty-two public housing properties, including Highland

---

[3] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) Defendants District of Columbia Housing Authority and Highland Residential LP's Memorandum in Support of Motion to Dismiss ("Defs.' Mem."), ECF No. 27-1; (2) Defendants District of Columbia Housing Authority and Highland Residential LP's Memorandum in Support of Its Supplemental Motion to Dismiss Arguments ("Defs.' Suppl. Mem."), ECF No. 74; (3) the Declaration of Lori Barker ("Barker Decl."), ECF No. 74 at 15–16; (4) the Plaintiff's Memorandum in Opposition to Defendants District of Columbia Housing Authority's and Highland Residential LP's Motion to Dismiss ("Pl.'s Opp'n"), ECF No. 28; (5) the Plaintiff's Opposition to Defendants District of Columbia Housing Authority and Highland Residential LP's Supplemental Motion to Dismiss Under Rule 12(b)(1) ("Pl.'s Suppl. Opp'n"), ECF No. 63; (6) the Reply in Further Support of Defendants District of Columbia Housing Authority and Highland Residential LP's Motion to Dismiss ("Defs.' Reply"), ECF No. 29; (7) Defendants District of Columbia Housing Authority and Highland Residential LP's Reply to Plaintiff's Opposition to Its Supplemental 12(b)(1) Motion to Dismiss ("Defs.' Suppl. Reply"), ECF No. 70; (8) the Plaintiff's Second Notice of Supplemental Authority ("Pl.'s 2d Notice"), ECF No. 86; and (9) Defendants District of Columbia Housing Authority and Highland Residential LP's Supplemental Reply to Plaintiff's Notice of Supplemental Authority ("Defs.' Resp."), ECF No. 87.

Dwellings." Id. ¶ 7. The "DCHA either directly operates or contracts with a third-party management company to operate these properties." Id.

1. **The Defendants' Alleged Installation of Surveillance Cameras on and Around the Plaintiff's Home**

According to the plaintiff, the DCHA and Highland Residential "began installing security cameras and modifying the video surveillance system at Highland Dwellings in or around August 2017." Id. ¶ 17. However, according to the plaintiff, the "DCHA failed to hold DCHA Board of Commissioners meetings or property meetings open to for public comment during September or October of 2017, when the cameras were being installed[,]" id. ¶ 127, and thus did not provide residents an opportunity to be heard about the installation of the camera system. On November 9, 2017, the plaintiff received a notice that "a camera company would enter her home to install security cameras on November 16, 2017." Id. ¶ 18. The plaintiff contends that "[f]ollowing this first notice, and for several months thereafter, [the] DCHA made multiple attempts to install a camera on [the plaintiff]'s home and a power box in her bedroom, while refusing to respond to [the plaintiff]'s repeated requests for basic information about the cameras' capabilities and purpose." Id. ¶ 19. Specifically, the plaintiff alleges that she "attempted to receive information about the security cameras and video surveillance systems during monthly property meetings" with Highland Dwellings property manager, Lori Barker, id. ¶¶ 125–26, but that Ms. Barker refused to answer her questions and told the plaintiff "that she had no choice and had to allow the installation[,]" id. ¶¶ 129–30. Having allegedly not been provided information regarding why installation inside of her home was necessary or regarding the power box's function, the plaintiff refused to allow the camera installation company to access the inside of her home on November 16, 2017, and again in December 2017. See id. ¶¶ 21–26.

3

After the plaintiff refused access to the interior of her home for the second time, the DCHA "served [her] with a thirty-day notice to vacate or cure in January 2018[,]" id. ¶ 27, and "[o]n or about January 28, 2018, [the] DCHA and H[ighland] R[esidential] began installing the power boxes for the camera outside of [the plaintiff]'s property without her knowledge or consent[,]" id. ¶ 28. After she observed the construction workers attempting to install the cameras, the plaintiff represents that she "approached the construction workers and asked them to stop installing the power boxes." Id. ¶ 29.

In response to the notice to vacate or cure, the plaintiff "filed a complaint with the rental office at Highland Dwelling on January 30, 2018, in an attempt to gather more information about the cameras prior to their installation[,]" id. ¶ 30, pursuant to Section 14-6301.3 of the D.C. Municipal Regulations, "which permits a resident of DCHA housing who 'believes that he or she is aggrieved, or adversely affected, by an act or failure to act by [a] DCHA official' to file an administrative complaint with [the] DCHA's Central Office[,]" id. ¶ 31 (quoting D.C. Mun. Regs. tit. 14, § 6301.3 (2017)). Specifically, the plaintiff's complaint indicated that she was challenging the process and decision to install the cameras at Highland Dwellings because she "d[id] not have sufficient information as to how the decision was made to install 80+ cameras in our community[,]" and emphasized that she "did NOT want them entering my home to install[ the power boxes]." Id. ¶ 119 (quoting id., Exhibit ("Ex.") F (Plaintiff's DCHA Complaint (Jan. 30, 2018)), ECF No. 1).

After the plaintiff filed her complaint with the rental office, the plaintiff contends that, despite her continued objections and prior to responding to her complaint, the "[d]efendants again came to [her] home to install the cameras[.]" Id. ¶ 32. The plaintiff again requested that the construction workers cease installing the surveillance cameras on the side of her home,

"explain[ing] that . . . [she] did not want the cameras installed until after she had communicated with [the defendants]." Id.

According to the plaintiff, Mickey Green, a DCHA police officer, then approached the plaintiff, see id. ¶ 34, and in response to the plaintiff's request for more information, "Officer Green loudly told [the plaintiff] that she did not have any rights as a public housing resident and that she could not stop the worker from installing the cameras[,]" id. ¶ 35. And, the plaintiff alleges that after she told Officer Green that she did have rights and sought to assert them, he responded aggressively "by using the full force of his body weight to restrain [the plaintiff] against the exterior of the house." Id. ¶ 37. As the plaintiff allegedly pleaded with Officer Green not to touch her, a crowd of residents gathered, and the plaintiff's son exited the apartment and approached Officer Green to further plead with him to stop touching the plaintiff. See id. ¶¶ 39–42. Officer Green then allegedly "slammed [the plaintiff's] son against a wall[,]" id. ¶ 43, and told him that he and the plaintiff "were going to jail[,]" id. ¶ 44.

In response to Officer Green's actions, the plaintiff called 911 to request assistance. See id. ¶ 45. However, according to the plaintiff, the Metropolitan Police Department ("MPD") officers dispatched to the plaintiff's home arrested the plaintiff and her son and transported them to jail, where they spent the night, before charges were ultimately dismissed. See id. ¶¶ 46–48, 50. And, the plaintiff represents that, while the plaintiff and her son were in detention, the "[d]efendants installed the camera and related equipment on the upper exterior wall of [her] home." Id. ¶ 51.

## 2. The Defendants' Surveillance Camera Network at Highland Dwellings

The plaintiff represents that "[t]here are approximately eighty security cameras located within Highland Dwellings[,]" id. ¶ 52, and that these cameras are "installed on the side of people's homes[,]" id. ¶ 60, and, in some cases, "right next to residential windows[,]" id. ¶ 61.

5

"The cameras are covered by circular domes[,]" id. ¶ 53, and connect to "one or two power boxes[,]" installed on the outside of residents' homes, id. ¶ 55, as well as transmitters affixed to the sides of the residential buildings, see id. ¶ 54.

The plaintiff further alleges that there is "approximately one camera for two-and-a-half Highland Dwelling homes[,]" id. ¶ 58, and that "the majority of the public housing complex is visible and monitored by the security cameras[,]" id. ¶ 59. The plaintiff contends that "[t]he large number of cameras in such a small area creates a level of surveillance that is highly offensive in a residential context where residents are carrying out their personal daily routines, including, among other things: sleeping, eating, raising their children, gathering, and bathing." Id. ¶ 63.

In addition to the alleged pervasiveness of these cameras, the plaintiff argues that they have "sophisticated features" that add to their intrusiveness. Id. ¶ 65. The plaintiff alleges that "at a minimum, the cameras have a 1280 x 720p high-definition resolution, they can auto-focus and zoom up to an estimated seventy feet, and they have infrared capabilities (i.e., 'night vision') that allow the cameras to capture clear videos at night." Id. ¶ 65. As a result of their "advanced remote-focus capabilities," id. ¶ 67, the plaintiff states that "the security cameras clearly capture a view of the front entrance of [the plaintiff]'s . . . home[,]" id. ¶ 71, and that they "can render footage from within [the plaintiff]'s apartment unless her windows are covered[,]" id. ¶ 72, because she "has windows exposing, at a minimum, her bedroom, bathroom, and living room[,]" id. ¶ 73. At bottom, the plaintiff represents that the "cameras' constant surveillance, high-quality images, and advanced technological features enable the[ defendants] to capture intimate details about [her] life and movements that would otherwise remain private information." Id. ¶ 68.

The plaintiff represents that the system of surveillance cameras feeds into the DCHA's "Command Center" id. ¶ 78, which supports the DCHAPD's public safety operations and "features a console controlling twelve 55-inch monitors streaming live images from 650 cameras[,]" id. ¶ 81.  According to the plaintiff, the DCHA "Command Center's video system stores data for at least thirty days and can play back the older footage stored in the system." Id. ¶ 82.  The plaintiff alleges that the "DCHA's Chief of Police and Director of Public Safety, Joel Maupin, directly acknowledged that [the] DCHA uses the camera footage to preemptively monitor innocuous, lawful conduct[,]" rather than limit its use of the surveillance camera system to investigative purposes.  Id. ¶ 87.  Additionally, according to the plaintiff, "staff stationed at [the DCHA] headquarters monitor housing complexes and alert [the] MPD and [the] DCHAPD if they view activity such as loitering or street gambling[,]" id. ¶ 88, based on the DCHAPD's "belief that such activities 'precede violence[,]'" id. ¶ 89.  The plaintiff also represents that the DHCA uses the camera footage to "identify individuals and arrest or ban them from the area[,]" id. ¶ 90, and to "allocate DCHAPD patrols" based on crime statistics, id. ¶¶ 100–01.  In addition to the DCHA and DCHAPD's alleged collection, retention, and use of the surveillance camera footage, the plaintiff alleges that the DCHA uses its camera system to cooperate with local law enforcement and federal agencies.  See id. ¶¶ 91–97.

The plaintiff alleges that, as a result of the continued presence of surveillance cameras, she "does not feel comfortable hosting gatherings and inviting guests over to her home[,]" id. ¶ 235, and that she "stopped hosting associational meetings about tenant's rights and social justice initiatives at her home[,]" id. ¶ 236.  The plaintiff also alleges that, as a result of the defendants' "constant surveillance[,]" id. ¶ 140, and "the traumatic experience of being harassed by Officer Green and of enduring one night in jail[]" due to her arrest, id. ¶ 147, she continues to

suffer from "emotional distress, mental anguish, embarrassment, humiliation, and disrupted sleep[,]" id. ¶ 151.

## B.      Procedural Background

On December 12, 2022, the plaintiff filed her Complaint in this case. See id. at 1.  On May 1, 2023, the Court granted the parties' joint motion to refer this case for mediation, see Order at 1 (May 1, 2023), ECF No. 20, but the parties were unsuccessful in resolving their dispute through mediation, and thus, the Court set a briefing schedule for the filing of the defendants' motion to dismiss, see Order at 1 (Aug. 7, 2023), ECF No. 25.  Consistent with the Court's schedule, the defendants filed their original motion to dismiss on September 15, 2023. See Defs.' Mot. at 1.  On October 13, 2023, the plaintiff filed her opposition, see Pl.'s Opp'n at 1, and on October 23, 2023, the defendants filed their reply in support of their motion to dismiss, see Defs.' Reply at 1.

As indicated above, on March 7, 2025, the Court issued a Memorandum Opinion and Order granting a separate motion to dismiss filed by defendants District of Columbia and the MPD after concluding that the plaintiff had not established Article III standing to sue these two defendants.  See generally Pondexter-Moore v. District of Columbia, No. 22-cv-3706 (RBW), 2025 WL 740455 (D.D.C. Mar. 7, 2025).  On April 17, 2025, the remaining defendants in this case filed their supplemental motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).  See Defs.' Suppl. Mot. at 1.  On May 8, 2025, the plaintiff filed her opposition to the defendants' supplemental motion to dismiss, see Pl.'s Suppl. Opp'n at 1, and on May 22, 2025,

the defendants filed their reply in support of their supplemental motion to dismiss, see Defs.'

Suppl. Reply at 1.[4]

On January 28, 2026, the Court held a motion hearing on the defendants' pending

motions to dismiss, which this Memorandum Opinion now resolves. See Minute Entry (Jan. 28,

2026). During the motion hearing, the Court queried the parties regarding the applicability and

effect of the District of Columbia Circuit's recent decision in United States v. Green, 149 F.4th

733 (D.C. Cir. 2025), on the plaintiff's Fourth Amendment claims. Because neither party was

aware of that decision, the Court indicated that the parties could submit supplemental briefing

addressing the Court's queries. Thus, on February 20, 2026, the plaintiff filed a notice of

supplemental authority addressing Green, see generally Pl.'s 2d Notice, to which the defendants

responded on February 25, 2026, see generally Defs.' Resp.

## II.      STANDARDS OF REVIEW

### A.      Federal Rule of Civil Procedure 12(b)(1)

"Federal [district] courts are courts of limited jurisdiction[,]" Kokkonen v. Guardian Life

Ins. Co. of Am., 511 U.S. 375, 377 (1994), and therefore, "[a] motion for dismissal under

[Federal Rule of Civil Procedure] 12(b)(1) 'presents a threshold challenge to the [C]ourt's

jurisdiction[,]'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.)

(quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)). Thus, the Court is obligated to

dismiss a claim if it "lack[s] . . . subject matter jurisdiction[.]" Fed. R. Civ. P. 12(b)(1). And,

because "[i]t is to be presumed that a cause lies outside [the Court's] limited jurisdiction,"

---

[4] After the parties conferred on the plaintiff's objections to the defendants' unredacted supplemental motion to
dismiss, the Court granted the defendants' motion for leave to file a redacted version of the supplemental motion to
dismiss, which this Memorandum Opinion resolves. See Minute Order (May 27, 2025). And, although the Court
has reviewed the unredacted briefing and exhibits relating to the defendants' supplemental motion to dismiss, as
discussed below, the Court concludes that it need not discuss the particular details of the portions of these
documents filed under seal to resolve the defendants' supplemental motion. See infra Sec. III.A.1.

Kokkonen, 511 U.S. at 377, the plaintiff bears the burden of establishing by a preponderance of the evidence that a district court has subject matter jurisdiction, see Nurse v. Sec'y of Air Force, 231 F. Supp. 2d 323, 326 (D.D.C. 2002) (Walton, J.) (citations omitted).

In deciding a motion to dismiss based upon lack of subject matter jurisdiction, the Court "need not limit itself to the allegations of the complaint." Grand Lodge of the Fraternal Ord. of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001). Rather, the "[C]ourt may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see also Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005). Additionally, the Court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged[.]'" Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp., 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)). However, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13–14 (alterations in original) (citation and internal quotation marks omitted). And, the Court "need not accept bare legal conclusions nor unsupported inferences." Campaign Legal Ctr. v. Fed. Election Comm'n, No. 22-cv-3319 (CRC), 2024 WL 4263853, at *5 (D.D.C. Sept. 23, 2024) (citing Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002)).

**B.    Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) tests whether a complaint has properly "state[d] a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). "To survive a motion to

dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable interference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged."  Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).  While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth."  Iqbal, 556 U.S. at 679.  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678 (citing Twombly, 550 U.S. at 555).  Also, the Court need not "accept legal conclusions cast as factual allegations[,]" or "inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint[.]"  Hettinga, 677 F.3d at 476.  The Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice."  Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.    ANALYSIS

As indicated above, the defendants originally moved to dismiss the plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, but have now also moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), see Defs.'

11

Suppl. Mot., arguing that, based on the Court's reasoning in its prior Memorandum Opinion in this case, see generally Pondexter-Moore, 2025 WL 740455, the plaintiff has failed to establish that she has Article III standing to bring her claims, see Defs.' Suppl. Mem. at 1.  The Court will first address the defendants' supplemental motion to dismiss on jurisdictional grounds before turning to their motion to dismiss based on the merits of the plaintiff's claims.

**A.     The Defendants' Supplemental Motion to Dismiss the Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(1)**

In their supplemental motion to dismiss, the defendants argue that "[t]he plaintiff's allegations when viewed in light of the complaint and the relevant contextual evidence" do not establish that she has Article III standing to bring her claims because they fail to "demonstrate[] that she has suffered an injury in fact that was caused by [the] DCHA."  Defs.' Suppl. Mem. at 5. In support of their supplemental motion, the defendants have submitted: (1) a declaration from Lori Barker, the Highland Dwellings property manager, which purports to contradict the plaintiff's claims regarding the capabilities and use of the camera systems, see generally Def.'s Suppl. Mot., Ex. B (Declaration of Lori Barker ("Barker Decl."), ECF No. 74); and (2) an arrest report which purportedly contradicts the plaintiff's allegations regarding the nature of her arrest at her home, see Defs.' Suppl. Mem. at 8 (citing Ex. A (CCN # 18017218 – Arrest Report DC Housing Authority Police ("Arrest Report")), ECF No. 61.[5]

However, as the Court noted during the motion hearing held on January 28, 2026, although the Court may have the discretion to consider these two submissions at the motion to dismiss stage, it ultimately concludes that it would be inappropriate to do so here.  As the D.C. Circuit has indicated, "[a]s a general matter, a plaintiff's standing to pursue a claim rests on the

---

[5] As previously indicated, the Arrest Report has been placed under seal.

theory of injury presented in the complaint and the facts alleged in support of the claim." Haase v. Sessions, 835 F.2d 902, 907 (D.C. Cir. 1987). Thus, at the motion to dismiss stage, "the plaintiff is protected from an evidentiary attack on [her] asserted theory by the defendant, just as the defendant is protected from compulsory discovery." Id. In practice, this means that, at this early stage of the litigation, "the proof that can be considered outside the complaint is circumscribed." Ferrer v. CareFirst, Inc., 265 F. Supp. 3d 50, 52 (D.D.C. 2017). Although "[a] plaintiff can augment her pleading with an affidavit that contains specific facts to support standing[,]" id. (citing Haase, 835 F.2d at 907), the defendant "cannot put forward evidence outside the pleadings to challenge a plaintiff's standing[,]" id. (citing Haase, 835 F.2d at 908).

Here, the defendants' supplemental motion to dismiss is almost entirely based on purported facts not contained in the Complaint, i.e., the Barker Declaration and the Arrest Report, both of which directly dispute the underlying factual allegations contained in the plaintiff's Complaint and are intended to undermine her claim that she has Article III standing to pursue this case. The defendants argue that the Court may rely on these submissions "without disturbing the merits of the plaintiff's argument[,]" Defs.' Suppl. Reply at 4, because the Court may consider these exhibits solely for the purpose of determining whether the plaintiff has established that she has Article III standing based on the allegations contained in her Complaint, see id. at 4. However, the defendants have submitted these exhibits precisely to undermine the credibility of the allegations contained in the Complaint, which constitutes the very type of "evidentiary attack" that the defendants are precluded from making at this early stage of the case. Haase, 835 F.2d at 907. Accordingly, the Court will not consider these submissions in considering whether the plaintiff has established that she has Article III standing to pursue her

13

claims and will thus proceed with its standing analysis based only on those facts alleged in the plaintiff's Complaint.

1. **Whether the Plaintiff Has Established that She Has Article III Standing to Pursue Her Claims Against the Defendants**

"As the party invoking federal jurisdiction, the plaintiff[] bear[s] the burden of demonstrating that [she] ha[s] standing." TransUnion LLC v. Ramirez, 594 U.S. 413, 430–31 (2021) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). "Moreover, the plaintiff must demonstrate standing with respect to each claim and form of relief sought." Am. Freedom L. Ctr. v. Obama, 106 F. Supp. 3d 104, 108 (D.D.C. 2015) (Walton, J.) (citing Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 153 (2010)). To satisfy the standing requirement under Article III, "a litigant seeking to invoke the jurisdiction of a federal court must demonstrate that (1) [she] has suffered an injury-in-fact (2) which is caused by, or is fairly traceable to, the defendant[s'] alleged unlawful conduct and (3) which is likely to be redressed by a favorable decision of the court." Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 48 (D.C. Cir. 1999) (citing Lujan, 504 U.S. at 560). "The absence of any one of these three elements[—injury-in-fact, causation, or redressability—]defeats standing." Newdow v. Roberts, 603 F.3d 1002, 1010 (D.C. Cir. 2010).

To establish an injury in fact, the plaintiff must show that she has suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[.]" Lujan, 504 U.S. at 560; see also Spokeo v. Robins, 578 U.S. 330, 339–40 (2016) (counseling that a "particularized" injury is one that "affect[s] the plaintiff[s] in a personal and individual way" and a "concrete" injury is a "real, and not abstract" injury that "must actually exist" (internal quotation marks omitted)). And, where a plaintiff seeks injunctive relief, "harm in the past . . . is not enough to establish a present controversy, or in terms of

standing, an injury in fact." Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus, 317 F.3d 334, 336 (D.C. Cir. 2003).  Instead, the plaintiff "must allege a likelihood of future violations of [her] rights . . . , not simply future effects from his past violations." Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1273 (D.C. Cir. 1994).

The defendants do not dispute that the plaintiff has established the causation and redressability requirements for Article III standing, and thus, the Court need only address whether the plaintiff has stated an injury in fact.  See generally Defs.' Suppl. Mem.  The Court will address each of the plaintiff's claims in turn.  And, for the following reasons, the Court concludes that the plaintiff has established that she has standing to bring her Fourth Amendment, Fifth Amendment, and common law tort claims, but that she has failed to establish that she suffered an injury in fact sufficient to support her First Amendment claim.

### a.      The Plaintiff's Fourth Amendment and Common Law Claims

The Court begins its analysis with the plaintiff's Fourth Amendment and common law intrusion upon seclusion claims.[6]  Courts have regularly concluded that plaintiffs have suffered an injury in fact sufficient to bring a Fourth Amendment claim when they have established that they were subjected to government surveillance, resulting in their data being collected and retained by a defendant.  See Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 209 (4th Cir. 2017); Schuchardt v. President of the U.S., 839 F.3d 336, 344–46 (3d Cir. 2016); Am. C.L. Union v. Clapper, 785 F.3d 787, 801–02 (2d Cir. 2015); Leaders of a Beautiful Struggle v. Baltimore Police Dep't, 456 F. Supp. 3d 699, 708 (D. Md. 2020), reversed and remanded on other grounds, 2 F.4th 330 (4th Cir. 2021).  And, the Supreme Court has recognized that injuries

---

[6] The defendants do not challenge the plaintiff's standing as to her Fourth Amendment "totality of movements" theory of standing.  See Defs.' Suppl. Reply at 10.

associated with common law intrusion upon seclusion torts are injuries "traditionally recognized as providing a basis for lawsuits in American courts." TransUnion LLC v. Ramirez, 594 U.S. 413, 425 (2021) (citations omitted).

Here, the plaintiff alleges that she, as a resident of Highland Dwellings, has been subjected to government surveillance by the operation of the defendants' camera system. Specifically, the plaintiff alleges that there is "approximately one camera for two-and-a-half Highland Dwelling homes[,]" Compl. ¶ 58, and that "the majority of the public housing complex is visible and monitored by the security cameras[,]" id. ¶ 59. She further alleges that "the security cameras clearly capture a view of the front entrance of [the plaintiff]'s . . . home[,]" id. ¶ 71, and that they "can render footage from within [the plaintiff]'s apartment unless her windows are covered[,]" id. ¶ 72. Despite these allegations, the defendants argue that the plaintiff has provided "nothing more than general assertions about hypothetical capabilities of the DCHA surveillance system as a whole without any specificity as to her own claims[,]" Defs.' Suppl. Mem. at 7, and that she has failed to establish that she suffered an injury in fact because she "does not actually allege any facts that demonstrate that she has actually been recorded within her home or had any intimate details about her life captured by the [d]efendants[,]" id.

However, the defendants' arguments miss the mark. While it is true that the plaintiff bears the burden of establishing that she has suffered an injury in fact, this standard "does not require certainty; instead, it understandably holds [that] a plaintiff's risk of harm cannot be based upon a 'highly attenuated chain of possibilities.'" N.Y. Republican State Comm. v. Sec. & Exch. Comm'n, 927 F.3d 499, 504 (D.C. Cir. 2019) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 410 (2013)). Far from merely alleging a "highly attenuated chain of possibilities[,]" id., resulting in the collection and retention of her personal data, the plaintiff alleges that the

16

defendants operate and maintain a system of surveillance cameras in and around her home, Compl. ¶ 58, and that these cameras can capture footage from within her home, see id. ¶ 72. Thus, the Court concludes that at this stage of the case, the plaintiff has satisfied her burden of showing that she has suffered a concrete and particularized injury in fact based on the collection and retention of her personal information, including allegedly from within her home. Further, for the same reason, the Court concludes that the plaintiff has established that she has suffered an injury associated with her common law intrusion upon seclusion claim. See TransUnion, 594 U.S. at 425.

### b.    The Plaintiff's First Amendment Claim

The defendants next argue that the plaintiff has failed to adequately establish that she has Article III standing to pursue her First Amendment claim, which she alleges is based on "the presence of the surveillance cameras[,]" Compl. ¶ 235, and her "fears of constant surveillance[,]" id. ¶ 236. Specifically, the defendants argue that that the plaintiff has failed to plausibly show that she suffered any harm because: (1) while the plaintiff was issued a notice to cure or vacate in response to her protest of the installation of the surveillance camera system, the defendants did not take any further action against her, see Defs.' Suppl. Reply at 8; and (2) the Arrest Report and affidavit submitted by the defendants undermine the plaintiff's representations regarding the factual circumstances of her arrest, see id. However, the Court has already concluded that it will not consider the records submitted by the defendants in their supplemental motion, see supra Sec. III.A, and thus, the Court need not address this second argument. The Court does agree, however, with the defendant that, based on the Complaint itself, the plaintiff has failed to adequately show that she has standing to bring her First Amendment claim.

17

As indicated above, to establish an injury in fact, the plaintiff must show that she has suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. In the First Amendment context, a plaintiff need not show "a direct prohibition against the exercise of [her] First Amendment rights[,]" so long as she shows that threatened sanctions have chilled her protected activity. Laird v. Tatum, 408 U.S. 1, 11 (1972). Nonetheless, the plaintiff must establish that "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and [that] the [plaintiff is] either presently or prospectively subject to the regulations, proscriptions, or compulsions that [s]he [is] challenging." Id.

On the other hand, "[s]ubjective 'chill' alone" is insufficient to establish an injury in fact. Act Now to Stop War & End Racism Coal. v. District of Columbia, 589 F.3d 433, 435 D.C. Cir. 2009) (quoting Am. Library Ass'n v. Barr, 956 F.2d 1178, 1194 (D.C. Cir. 1992)). Instead, the plaintiff must show that she "suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself." United Presbyterian Church in the U.S.A. v. Reagan, 738 F.2d 1375, 1378 (D.C. Cir. 1984). That is because the "'[c]hilling effect' is cited as the reason why the governmental imposition is invalid rather than as the harm which entitles the plaintiff to challenge it." Id.

In the context of government surveillance programs, the Supreme Court has cautioned that it is insufficient for a plaintiff to allege that the "mere existence, without more" of a purportedly overbroad government surveillance program is chilling her First Amendment rights. Laird, 408 U.S. at 10. That is because the Court must guard against plaintiffs who, in essence, "seek[] a broad-scale investigation, conducted by themselves as private parties armed with the subpoena power of a federal district court and the power of cross-examination to probe into" the

18

challenged surveillance programs, id. at 14, "with the district court determining at the conclusion of that investigation the extent to which those activities may or may not be appropriate to the [agency's] mission[,]" id. On the other hand, the District of Columbia Circuit has observed that "a targeted investigation of an individual based solely on the exercise of his associational rights resulting in concrete harms" to that individual is sufficient to establish an injury in fact. Clark v. Library of Congress, 750 F.2d 89, 93 (D.C. Cir. 1984).

Here, the Complaint alleges that the defendants violated the plaintiff's First Amendment rights due to the "installation of surveillance cameras around [her] home[,]" Compl. ¶ 229, which she contends "curtails her right to association[,]" id., and that, "[d]ue to the presence of the surveillance cameras, [she] does not feel comfortable hosting gatherings and inviting guests over to her home[,]" id. ¶ 235. Although the plaintiff argues in response to the defendants' supplemental motion to dismiss that she suffered an injury in fact adequate to support her First Amendment claim because she has alleged that she "was threatened with eviction, arrested, and that these events provide a reasonable basis for her belief that she can no longer protest the cameras or engage in associational activities at Highland Dwellings[,]" Pl.'s Suppl. Opp'n at 18, the government enforcement action the plaintiff is actually challenging in her Complaint is not her threatened eviction or arrest as retaliation for engaging in protected speech, see Compl. ¶¶ 227–36, and the plaintiff appears to disclaim her arrest as a basis for her injury in fact, see Pl.'s Suppl. Opp'n at 18 ("The [d]efendants mistake the [p]laintiff's arrest for the harm itself."). Instead, the relevant government action the plaintiff challenges is the defendants' purported surveillance of her through the use of the camera system at Highland Dwellings. Accordingly, the Court must determine whether the plaintiff has adequately alleged that the challenged

19

government action in this case—i.e., the defendants' continued surveillance at her apartment and apartment complex—has caused her to suffer a First Amendment injury in fact.

For the following reasons, the Court concludes that the plaintiff has not adequately alleged that she has "suffered some concrete harm . . . apart from the 'chill' itself." United Presbyterian Church in the U.S.A., 738 F.2d at 1378.  First, because the plaintiff does not allege that the surveillance camera system is "regulatory, proscriptive, or compulsory in nature," Laird, 408 U.S. at 11, the Court must determine whether the plaintiff's alleged injury is her subjective fear and her response to the "mere existence, without more" of the defendants' surveillance system, id. at 10, or whether she has adequately alleged that the defendants' surveillance has caused her some other harm.  The plaintiff argues that she has satisfied her burden because she has alleged that her threatened arrest and eviction have caused her to reasonably fear that the "DCHAPD is watching her, ready to intervene if she expressed herself in a way th[e defendants] deem unfit."  Pl.'s Suppl. Opp'n at 20.  The plaintiff further alleges that, unlike Laird, the defendants' alleged conduct in this case gives rise to an injury in fact because it involves the gathering of non-public information and has caused her to abandon "the social justice initiatives she formerly hosted" due to her fear that she and her associates may be identified by the defendants.  See id. at 9–10.  According to the plaintiff, these facts, taken together, show that she "suffers from an objective chill—not a 'subjective chill'—because her injury is present and concrete, not distant or hypothetical."  Id. at 9.

However, the plaintiff's arguments are unavailing for several reasons.  At bottom, the plaintiff's purported First Amendment injury as pleaded in her Complaint is far closer to the subjective chill in Laird than the "targeted investigation" of the plaintiff in Clark, which was "based solely on the exercise of his associational rights[,]" and resulted in other concrete harms,

20

including the defendant's failure to promote him.  See 750 F.2d at 93.  The crux of the plaintiff's argument here is that she believes that the DCHAPD is actively watching her, as opposed to merely generally monitoring Highland Dwellings, due to her prior opposition to the installation of the cameras.  See Pl.'s Suppl. Opp'n at 20.  In support of her argument, the plaintiff contends that her attempts to gain more information about the camera system were "met with silence or aggression by the [d]efendants[,]" including her threatened eviction and arrest.  Id. at 18.  However, she does not allege that the defendants threatened her with targeted surveillance or any future adverse action in retaliation for her continued objection to the surveillance cameras, hosting social justice meetings, or any other First Amendment activity, see Clark, 750 F.2d at 93–94, and, during the January 28, 2026, motion hearing, expressly confirmed that she is not pursuing a First Amendment retaliation claim.

Further, although the plaintiff attempts to distinguish Laird based on the type of information collected by the cameras in this case, the Court is not persuaded based on the allegations in her Complaint.  To be sure, there is a "vital relationship between freedom to associate and privacy in one's associations[,]" Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson, 357 U.S. 449, 462 (1958), and thus, for example, "compelled disclosure of affiliation with groups engaged in advocacy may constitute a[] restraint on [the] freedom of association[,]" id.  However, the plaintiff has not alleged that any information purportedly collected by the defendants is of the type and nature that the surveillance cameras effectively compel the disclosure of the names or other personally identifiable information of the plaintiff's associates, or that footage captured by the cameras is used in tandem with other surveillance technology capable of identifying her associational ties, such as facial recognition technology.  See Am. C.L. Union, 785 F.3d at 802–03 (concluding that the government's alleged

21

collection of communication metadata harmed the plaintiffs' members' interests in keeping their associations and contacts private). Thus, without more, the Court concludes that the plaintiff has failed to establish that she has Article III standing to pursue her First Amendment claim, and accordingly, the Court must grant the defendants' supplemental motion to dismiss to the extent that it seeks to dismiss Count VI.

  c.  **The Plaintiff's Fifth Amendment Substantive Due Process Claim**

Finally, the Court turns to the plaintiff's Fifth Amendment substantive due process claim.[7] However, to the extent that the defendants challenge the plaintiff's standing regarding her substantive due process claim, which they have only done in their reply, see Defs.' Suppl. Reply at 9, their argument is unpersuasive, even if it can be properly considered due to the Court's obligation to assure itself of its subject matter jurisdiction, see Taitz v. Obama, 754 F. Supp. 2d 57, 61–62 (D.D.C. 2010) ("Courts ordinarily decline to consider arguments that are raised for the first time in a reply to an opposition."). In their reply, the defendants argue that the plaintiff has failed to adequately allege that her purported Fifth Amendment "right to raise children free from government surveillance" is "a legally cognizable interest under the Fifth Amendment Due Process Clause, [and thus] her due process claim must also fail." Defs.' Suppl. Reply at 9. However, the plaintiff's purported injury giving rise to her substantive due process claim is the defendants' alleged surveillance of her home and her movements on the apartment complex grounds, and the harm she contends results from that surveillance. See Pl.'s Suppl. Opp'n at 24.

As the Court has already concluded in the context of the plaintiff's Fourth Amendment and common law claims, her allegations suffice at this stage of the case to show that the alleged

---

[7] The defendants do not challenge the plaintiff's standing to pursue her Fifth Amendment procedural due process claim. See Defs.' Suppl. Reply at 10.

surveillance has caused her a Fifth Amendment substantive due process injury of the type

"traditionally recognized as providing a basis for lawsuits in American courts." TransUnion, 594

U.S. at 425.  To be sure, to survive the defendants' motion to dismiss pursuant to Rule 12(b)(6),

the plaintiff must plausibly establish that she has a cognizable liberty or property interest at

stake, see Mathews v. Eldridge, 424 U.S. 319, 332 (1976), and that those interests are distinct

from her interests protected by the First or Fourth Amendment, which the Court will address

below, see infra Sec. III.B.2.b.  However, the Court concludes that the plaintiff has adequately

established Article III standing to pursue her substantive due process claim based on the alleged

injury arising from the defendants' alleged surveillance of her home, even considering the

defendants' belated challenge in their reply brief.

Having concluded that the plaintiff has adequately established that she has Article III

standing to bring her Fourth Amendment, Fifth Amendment, and common law tort claims at this

early stage of the litigation, but that she has failed to do so in regards to her First Amendment

claim, the Court must grant in part and deny in part the defendants' supplemental motion to

dismiss the plaintiff's claims.  Accordingly, the Court will proceed to the merits of the plaintiff's

Complaint as to Counts I–V.

**B.      The Defendants' Motion to Dismiss the Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

The defendants argue that the Court must dismiss the plaintiff's Fourth Amendment

claims (Counts I and II) because she has failed to adequately allege that the defendants

conducted a search, whether through collecting private information from within her home or

tracking the totality of her movements outside her home.  See Defs.' Mem. at 7.  Similarly, the

defendants argue that the plaintiff's common law intrusion upon seclusion tort claim (Count III)

23

must be dismissed because the plaintiff fails to plausibly allege that the defendants "actually or intentionally used the surveillance cameras to invade the privacy of her or any other tenant's home within Highland Dwellings." See id. at 21.  In regards to the plaintiff's procedural and substantive due process claims (Counts IV and V), the defendants argue that (1) they provided the plaintiff with all the due process she was entitled to because they "followed the terms of her lease agreement, she and an opportunity to be heard at the November 2017 meeting, and there was no significant change which required 30-day notice[,]" id. at 19; and (2) that the plaintiff has failed to show that the defendants' alleged actions violated any enumerated or unenumerated substantive due process right, see id. at 19–20.[8]

In opposition to the defendants' motion, the plaintiff argues that she has adequately established that the defendants have violated her Fourth Amendment and common law privacy rights by collecting both private information from within her home and by tracking her movements throughout her apartment complex.  See Pl.'s Opp'n at 12.  The plaintiff further responds that she "has sufficiently alleged violations of both [her] procedural and substantive due process [rights] under the Fifth Amendment" because the defendants' surveillance "depriv[es] her of property and liberty without adequate safeguards" and "depriv[es] her of fundamental rights to liberty and privacy."  Id. at 23.

### 1. The Plaintiff's Fourth Amendment Claims (Counts I and II)

The Court first addresses the plaintiff's Fourth Amendment claims, which are based on two separate theories: (1) that the defendants conducted a search by collecting information from

---

[8] Although the defendants argued in their motion to dismiss that the plaintiff's Fifth Amendment and common law tort claims were untimely filed under the relevant statutes of limitations, the defendants failed to mention this argument in their reply brief or otherwise respond to the plaintiff's counter-argument that the defendants' alleged surveillance constitutes a continuing violation.  See generally Defs.' Reply.  Because the defendants have failed to address these arguments in their reply, the Court treats them as abandoned.  See Pauling v. District of Columbia, No. 13-cv-934 (KBJ), 2015 WL 13891312, at *1 (D.D.C. June 15, 2025) ("Courts have properly and construed this type of silence as abandonment of the argument in question.") (listing cases).

within the plaintiff's home using the surveillance cameras located near the windows of her unit, see Compl. ¶¶ 152–73; and (2) the defendants conducted a search by tracking the totality of the plaintiff's movements outside her apartment, see id. ¶¶ 174–90.  The defendants argue that the plaintiff has failed to allege anything beyond the mere possibility that the defendants' surveillance cameras capture her information based on speculation regarding the cameras' capabilities, rather than concrete allegations that her home or movements on the property have actually been viewed or that footage of her home or movements have been used in any way, and thus, both of her Fourth Amendment claims fail.  See Defs.' Mem. at 7–8.  Moreover, the defendants argue that even if the plaintiff had alleged that information about her has been captured, she has failed to establish that the cameras observe anything within her home beyond what is observable to the public, see id. at 11, or that the cameras have captured sufficient information to form a comprehensive portrait of her public movements, see id. at 15.  In response, the plaintiff argues that she has plausibly alleged that the defendants have captured footage from within her apartment "based on the presence of the high-powered cameras pointed at her windows[,]" Pl.'s Opp'n at 13, and that the defendants' surveillance of her "every movement within and near Highland Dwellings" over a period of five years "create[s] the exact detailed mosaic of [the p]laintiff's life" that courts have concluded constitutes a search under the Fourth Amendment, id. at 20.

The Fourth Amendment prohibits "unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  "Warrantless searches are ordinarily 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  United States v. Green, 149 F.4th 733, 743 (D.C. Cir. 2025) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).

The Supreme Court has delineated two different tests to determine whether a particular challenged activity constitutes a search under the Fourth Amendment: (1) the "common-law trespassory test[,]" United States v. Jones, 565 U.S. 400, 409 (2012), which the plaintiff does not raise in this case, see generally Compl.; and (2) the traditional "Katz reasonable-expectation of privacy test[,]" Jones, 565, U.S. at 409.  Under Katz and its progeny, the Supreme Court has held that "[w]hen an individual 'seeks to preserve something as private[,]' and [her] expectation of privacy is 'one that society is prepared to recognize as reasonable,' . . . official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause."  Carpenter v. United States, 585 U.S. 296, 304 (2018) (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).

The plaintiff's claims in this case implicate two different lines of Fourth Amendment legal authority flowing from Katz.  Count I, which focuses on the alleged use of surveillance cameras to capture footage from within her home, implicates—at least in part—the public-view doctrine, which holds that the Fourth Amendment does not protect "[w]hat a person knowingly exposes to the public, even in his own home or office . . . ."  Katz, 389 U.S. at 351.  Count II, on the other hand, focuses on the aggregation of footage captured by the cameras throughout the housing complex that the plaintiff contends have the capacity to track the totality of her movements, and therefore implicates the mosaic theory, which "suggests that the government's collection of numerous discrete data points over time can create an impermissibly invasive picture of an individual's private life, even if any individual data point, standing alone, would not constitute a search."  Green, 149 F.4th at 746 (citing United States v. Tuggle, 4 F.4th 505, 517 (7th Cir. 2021)).  The Court will address each of these theories in turn.

26

### a. The Plaintiff's Fourth Amendment Claim Based on the Alleged Capture of Information from Within Her Home (Count I)

The defendant first argues that the plaintiff has failed to plausibly allege that a search was conducted in this case because: (1) she has not adequately alleged a "concrete instance" of surveillance, rather than only "making generalities about the alleged capabilities of the cameras[,]" Defs.' Mem. at 8; and (2) as a tenant, she "does not have a reasonable expectation of privacy in communal area[s] of multi-unit dwellings[,]" id. (citing United States v. Leake, 2020 U.S. Dist. LEXIS 112934, at *25 (D.D.C. 2020)), nor in common corridors or spaces outside her front door, see id. (citing United States v. Anderson, 533 F.2d 1210, 1214 (D.C. Cir. 1976)).  The plaintiff responds that she has adequately alleged a Fourth Amendment claim because she "explicitly alleges that she is monitored inside her home by the cameras[,]" Pl.'s Opp'n at 15 (citing Compl. ¶ 137), and that it is reasonable to infer that the interior of her apartment is captured by the cameras because they are operative and facing the plaintiff's windows, see id.

"At the very core [of the Fourth Amendment] stands the right of a man [or woman] to retreat into his [or her] home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961).  On the other hand, the Supreme Court has repeatedly emphasized that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."  Katz, 389 U.S. at 351. Applying this "public-view" doctrine, the D.C. Circuit and several other Circuit Courts of Appeal have concluded that the use of a pole camera to conduct surveillance does not constitute a search under the Fourth Amendment where the pole camera only captures an area exposed to public sight and does not exceed what would otherwise be observable by the public.  See Green, 149 F.4th at 749; Tuggle, 4 F.4th at 516–17; United States v. Hay, 95 F.4th 1304, 1314 (10th Cir.

27

2024), cert. denied, ___ U.S. ___, 145 S. Ct. 591 (2024); United States v. Gregory, 128 F.4th 1228, 1241 (11th Cir. 2025).

Here, the plaintiff alleges that as a result of their positioning near her apartment windows and their "advanced remote-focus capabilities," Compl. ¶ 67, the defendants' surveillance cameras "can render footage from within [the plaintiff]'s apartment unless her windows are covered[,]" id. ¶ 72; see id. ¶ 137 (alleging that her "movements inside her home are monitored by the surveillance cameras that are facing her windows").[9]  The defendants argue that the plaintiff's claims do not raise a plausible Fourth Amendment claim because she bases her claim on the purported capabilities of the surveillance cameras, rather than alleging any specific facts that the defendants have actually captured footage from inside her apartment.  See Defs.' Mem. at 9.

However, the Court concludes that the plaintiff has adequately alleged at this early stage of the litigation that the use of surveillance cameras does expose private areas within the plaintiff's home, and therefore plausibly constitutes a warrantless search.  Although the defendants assert that the plaintiff has not alleged a concrete instance of such surveillance, the plaintiff specifically alleges that the cameras are operational and positioned such that they capture at least portions of the interior of her home that are not otherwise visible to the public, see Compl. ¶¶ 72, 137, which distinguishes this case from Green and other pole camera cases

---

[9] The plaintiff also alleged that the defendants' surveillance cameras "clearly capture a view of the front entrance of" the plaintiff's home[,] see Compl. ¶ 71; however, this does not appear to be the basis for her claim in Count I, see id. ¶¶ 159–60 (focusing on the collection of information from within her home).  Nonetheless, the defendants argue that this allegation fails because the plaintiff does not have a reasonable expectation of privacy in the common areas outside the front door of her residence, see Defs.' Mem. at 8, and the plaintiff does not respond to the defendants' argument, see generally Pl.'s Opp'n.  Therefore, to the extent that the plaintiff relies on the collection of footage of the front entrance of her home, but not the inside of the home, the Court will treat this argument as conceded.  See Tnaib v. Document Tech., Inc., 450 F. Supp. 2d 87, 91 (D.D.C. 2006) ("When a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded." (quoting Fox v. Am. Airlines, Inc., No. 02-cv-2069 (RMU), 2003 WL 21854800, at *2 (D.D.C. Aug. 5, 2003), aff'd, 389 F.3d 1291 (D.C. Cir. 2004))).

involving the collection of footage that was otherwise viewable by the public, see, e.g., United States v. Gilbert, 769 F. Supp. 3d 756, 762 (N.D. Ohio 2025) (concluding that the government's installation of a pole camera constituted an unconstitutional search where it "was able to view into the home in a way not otherwise observable by the public, and it was set up without a warrant").  While discovery may reveal that the precise location of the cameras and their observational capabilities do not permit the viewing of the plaintiff's apartment beyond what would be otherwise observable from a public space unassisted by technology, the Court concludes that, construing the Complaint in the light most favorable to the plaintiff, as it must at this stage, the plaintiff has plausibly alleged that the observations captured by the surveillance cameras constitute a search under the Fourth Amendment.

Finally, although the defendants argue that the plaintiff has failed to show that "she was ever monitored specifically by the DCHA[,]" Defs.' Mem. at 11, the material Fourth Amendment determination is not whether the defendants actually reviewed the information that the plaintiff contends the cameras capture, but rather whether they collected and retained her information at all, see, e.g., Am. C.L. Union, 785 F.3d at 801; Wikimedia Found., 857 F.3d at 209–210.

Having concluded that the plaintiff has plausibly alleged that the defendants' surveillance of the private areas of her apartment constituted a warrantless search, and because "[w]arrantless searches are ordinarily 'per se unreasonable under the Fourth Amendment[,']" Green, 149 F.4th at 743 (quoting Katz, 389 U.S. at 357), the Court would ordinarily have to determine whether one of the exceptions to the warrant requirement applies in this case.  However, the defendants have not argued that any exception applies, and therefore, the Court concludes that the plaintiff has adequately alleged her constitutional claim of an unreasonable search of her home.  Thus, the

Court concludes that it must deny the defendants' motion to dismiss the plaintiff's Fourth Amendment claim based on the use of the surveillance cameras to collect her information from within her home.

> b.  **The Plaintiff's Fourth Amendment Claim Based on the Capture of the Totality of Her Movements (Count II)**

As indicated above, the plaintiff also argues that the defendants' surveillance violates her reasonable expectation of privacy in the totality of her movements on the grounds of the housing complex because the cameras capture her movements throughout the entire complex and the footage is stored for at least thirty days, thus allowing the defendants to piece together otherwise unknowable information about her life.  See Compl. ¶¶ 174–90.  The defendants argue that the plaintiff's mosaic theory fails because she has not alleged facts indicating that the defendants have gathered sufficient information about her movements beyond the public or common areas of the housing complex, and that courts have routinely concluded that pole camera surveillance does not constitute a search based on the mosaic theory.  See Defs.' Mem. at 13.  In response, the plaintiff argues that she has adequately alleged that the defendants' cameras have "captured all of [her] movements into, out of, and around her community for over six years," Pl.'s Opp'n at 19, and that this level of surveillance provides a level of detail into her life that violates her Fourth Amendment rights, see id.

"In its simplest form, the mosaic theory attempts to capture the idea that 'the government can learn more from a given slice of information if it can put that information in the context of a broader pattern, a mosaic.'"  Tuggle, 4 F.4th at 517 (quoting Matthew B. Kugler & Lior Jacob Strahilevitz, Actual Expectations of Privacy, Fourth Amendment Doctrine, and the Mosaic

Theory, 2015 Sup. Ct. Rev. 205, 205 (2015)).  The D.C. Circuit first articulated the mosaic

theory in United States v. Maynard, in which the Circuit held that

> the whole of a person's movements over the course of a month is not actually exposed to the public because the likelihood a stranger would observe all those movements is not just remote, it is essentially nil.  It is one thing for a passerby to observe or even to follow someone during a single journey as he goes to the market or returns home from work.  It is another thing entirely for that stranger to pick up the scent again the next day and the day after that, week in and week out, dogging his prey until he has identified all the places, people, amusements, and chores that make up that person's hitherto private routine.

615 F.3d 544, 560 (D.C. Cir. 2010).  The Court emphasized that "[p]rolonged surveillance

reveals types of information not revealed by short-term surveillance, such as what a person does

repeatedly, what he does not do, and what he does ensemble.  These types of information can

each reveal more about a person than does any individual trip viewed in isolation."  Id. at 562.

Thus, the mosaic theory may provide a basis for a party to challenge the "the government's

collection of numerous discrete data points over time . . . even if any individual data point,

standing alone, would not constitute a search."  Green, 149 F.4th at 746 (citing Tuggle, 4 F.4th at

517); see Orin S. Kerr, The Mosaic Theory of the Fourth Amendment, 111 Mich. L. Rev. 311,

320 (2012) ("The mosaic theory is therefore premised on aggregation: it considers whether a set

of nonsearches aggregated together amount to a search because their collection and subsequent

analysis creates a revealing mosaic.").

Upon review of the D.C. Circuit's decision in Maynard, the Supreme Court relied instead

on the traditional trespassory test, but several Justices noted that longer-term GPS tracking could

violate an individual's reasonable expectation of privacy in the totality of their public

movements.  See United States v. Jones, 565 U.S. 400, 430 (2012) (Alito, J., concurring); id. at

415 (Sotomayor, J., concurring) (emphasizing that "GPS monitoring generates a precise,

31

comprehensive record of a person's public movements that reflects a wealth of detail about a person's familial, political, professional, religious, and sexual associations").

"Since Jones, the Supreme Court has signaled a continuing willingness to consider the aggregation of data as distinctively problematic[,]" Green, 149 F.4th at 747 (listing cases), but "the Supreme Court has not yet required lower courts to apply it[,]" Tuggle, F.4th at 520. And, although the Court in Carpenter noted that "[a] majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements[,]" 585 U.S. at 310, it emphasized that its decision did not "call into question conventional surveillance techniques and tools, such as security cameras[,]" id. at 316.

In Green, which was decided after the parties' briefing in this case was complete, the D.C. Circuit directly addressed the intersection between pole cameras and the mosaic theory, acknowledging that

> [p]ole cameras pose a special challenge to the mosaic theory. In one sense, they are among the most common forms of surveillance. They rely on a public, unobstructed vantage point and off-the-shelf technology, not unlike an agent with binoculars perched atop a telephone pole. But unlike that unfortunate agent— who will get bored, blink[,] or need to stretch—a pole camera never looks away. It records everything, 24/7, for weeks or months, even years, preserving everything it sees.

Green, 149 F.4th at 748. The Court in Green noted that the aggregation of this information over time may allow the government to "reconstruct not only what happens at a location, but also the patterns and relationships of the individuals who pass through it." Id. at 748. The Court further observed that "as other technologies like artificial intelligence and facial recognition improve, the potential capabilities of ubiquitous cameras may grow exponentially." Id.

Nonetheless, the D.C. Circuit and several other circuit courts have rejected mosaic theory claims as applied to the use of pole cameras as part of targeted criminal investigations. See

32

Green, 149 F.4th at 749; Tuggle, 4 F.4th at 516–17; Hay, 95 F.4th at 1314; Gregory, 128 F.4th at 1241.[10]  In Green, the D.C. Circuit held that the use of a single pole camera to capture two days' worth of footage was "short-term, public-facing surveillance, limited in scope[,]" and thus, did not constitute a search under the Fourth Amendment.  149 F.4th at 749.  In so concluding, the Circuit noted that "there seems a material difference between the types of data the Supreme Court has found to implicate mosaic-type concerns—such as omnipresent location tracking—and the more limited information a fixed pole camera can capture."  Id. at 748.  This omnipresent location tracking, whether in the form of GPS information or cell site location information, "provides an all-encompassing record of the holder's whereabouts[,]" and "an intimate window into a person's life, revealing not only his [or her] particular movements, but through them his [or her] 'familial, political, professional, religious, and sexual associations.'"  Carpenter, 585 U.S. at 311 (quoting Jones, 565 U.S. at 415 (Sotomayor, J., concurring)).  Courts have also emphasized the "retrospective quality" of particular types of data, allowing the government "access to a category of information otherwise unknowable."  Id. at 312.  And the Supreme Court has observed that, collectively, these forms of surveillance allow the government to "achieve[] near perfect surveillance" of an individual.  Id.  However, the D.C. Circuit in Green emphasized that its holding "do[es] not suggest that pole-camera surveillance could never amount to a Fourth Amendment search[,]" and that its conclusion may be different under other circumstances, such as when it is "used over longer periods of time, with more cameras, or in combination with other tools—such as facial recognition, automated tracking[,] or artificial

---

[10] An en banc panel of the First Circuit, in reversing the district court's order granting the defendants' motion to suppress evidence derived from "the long-term use of [ ] video pole-camera surveillance of the front curtilage of the defendants' residence[,]" United States v. Moore-Bush, 36 F.4th 320, 321 (1st Cir. 2022) (Barron, J., concurring), divided over whether pole camera footage constituted a search, contrast id. at 328 (Barron, J., concurring) (concluding that a "pole camera trained by law enforcement on [the defendants'] home for eight months, generating a searchable digital video database of the activities visible to that camera," constituted a search), with id. at 363 (Lynch, J., concurring) (concluding that no search occurred).

intelligence—to build a far more comprehensive portrait of an individual's life." 149 F.4th at 749.

Here, the plaintiff alleges that over the past six years, her movements around Highland Dwellings have been captured by a system of multiple, publicly visible surveillance cameras, which are equipped with autofocus, zoom, and night vision capabilities, see Compl. ¶ 65, and that her information is stored for at least thirty days, see id. ¶ 184. Thus, the plaintiff contends that the defendants "know [her] daily schedule: what she does, everyone who enters and exits her home, when and what they bring, and the people with whom [she] associates in her community." Pl.'s Opp'n at 19.

However, for the following reasons, the Court concludes that the plaintiff has failed to adequately allege that the defendants' alleged surveillance cameras have tracked the whole of her movements, in violation of the Fourth Amendment. First, the defendants' security cameras are all located within Highland Dwellings, and thus, they can only track her "within and surrounding" the housing complex and merely depict the direction in which she is either going or coming from upon entering or leaving the housing complex. See Compl. ¶¶ 179–81. Thus, the cameras provide a limited perspective as to the totality of the plaintiff's movements across a maximum of fourteen acres, see Pl.'s Opp'n at 22, and not "an all-encompassing record of the [plaintiff's] whereabouts," including her "familial, political, professional, religious, and sexual associations[,]" Carpenter, 585 U.S. at 311 (quoting Jones, 565 U.S. at 415 (Sotomayor, J., concurring)); see Leaders of a Beautiful Struggle, 2 F.4th at 334 (each image included "around 32 square miles of Baltimore and can be magnified to a point where people and cars are

34

individually visible, but only as blurred dots or blobs").[11]  Without more, the Court cannot

reasonably infer based on the current state of the law that the defendants' surveillance cameras

capture sufficient information about the totality of the plaintiff's movements, to the degree that

the cameras constitute the type of "comprehensive" and "inescapable" surveillance the Supreme

Court has held violates an individual's reasonable expectation of privacy.  Carpenter, 585 U.S.

at 320.

Second, the Complaint does not adequately allege that the extent of the information

collected by the defendants' surveillance cameras regarding the plaintiff's public movements

otherwise provides an intimate window into her "associations, routines[,] or private conduct[,]"

to the degree that it would constitute a search based on the mosaic theory.  Green, 149 F.4th at

749.  The plaintiff argues that "[t]he cameras capture information about [her] entering and

leaving her home and moving around her community[,]" Pl.'s Opp'n at 20 (citing Compl.

¶¶ 179–81), as well as information about who visits her home and those with whom she

associates, see id. at 19.  The plaintiff further asserts that the cameras' capabilities allow the

defendants to capture "details such as [the p]laintiff's clothing, conversations, and even the

covers of books she might be carrying."  Id. (citing Compl. ¶¶ 163–65).  However, the plaintiff

does not allege that these surveillance cameras capture an amount of information that "build[s] a

far more comprehensive portrait" of the plaintiff's life, Green, 149 F.4th at 749, as opposed to

---

[11] Although the plaintiff originally brought suit against the District of Columbia and the MPD, in addition to the
DHCA defendants, alleging that the DHCA camera network feeds into a broader network of cameras that can be
patched together to monitor her movements across the city, the Court previously dismissed her claims because the
plaintiff failed to adequately establish that the District defendants had access to the DCHA systems and used such
access to actively monitor Highland Dwellings.  See Pondexter-Moore I, 2025 WL 740455, at *6.  Nonetheless, the
Court does not mean to suggest that centralized surveillance systems composed of multiple component systems do
not potentially raise Fourth Amendment concerns, despite the practical hurdles to plaintiffs seeking to challenge
systems operated by multiple defendants.

more "conventional surveillance techniques and tools, such as security cameras[,]"[12] Carpenter,

585 U.S. at 296.  For example, the plaintiff does not allege that the cameras are used in

combination with facial recognition, automated tracking, artificial intelligence, or other

supplemental technologies that the D.C. Circuit noted may raise constitutional questions in the

Fourth Amendment context.[13]  See Green, 149 F.4th at 749.

Moreover, as other courts have noted, "[t]he prospective and nonhistorical use" of

surveillance cameras, Tuggle, 4 F.4th at 425, such as the cameras in this case distinguish this

system from other cases in which surveillance technologies had a "retrospective quality" that

implicates the privacy concerns underlying the mosaic theory, Carpenter, 585 U.S. at 312.  And,

even focusing only on the prospective use and collection of information by the security cameras,

the plaintiff fails to allege that the surveillance cameras capture and retain her information for an

extended period of time.  To the contrary, the plaintiff only alleges that they retain footage from

the cameras for a period of at least thirty days.  Compl. ¶ 184.  Although the plaintiff also argues

that the defendants have continued their surveillance of her over the course of six years, she does

not allege that they have retained the images of her captured by the cameras indefinitely or even

---

[12] During the motion hearing on the defendants' motion to dismiss, the defendant appeared to argue that Carpenter categorically excepted security cameras from its holding.  However, the Supreme Court did not define what constitute "security cameras[,]" id. at 296, and the Court declines the defendants' invitation to adopt a categorical rule as to surveillance cameras, especially given the number of cameras that operate as part of the same system in this case.

[13] Although the plaintiff relies in part on First Circuit Court of Appeals Chief Judge Barron's concurring opinion in Moore-Bush as support for her mosaic theory claim, Chief Judge Barron was careful to distinguish the targeted installation of a pole camera for law enforcement investigative purposes from other forms of cameras "in which the camera fulfills a purpose distinct from tracking a person's movements at a particular residence and may only record where a particular individual is on a certain occasion as an incident of the camera's more general security-related function." Moore-Bush, 36 F.4th at 353 (Barron, J., concurring).  However, the Court does not rely on the purpose-based distinction alluded to in Moore-Bush for two reasons.  First, although cameras may be installed for more general security-related purposes, once installed, those purposes and uses may change.  Second, although the purpose of a camera's installation may be germane to the Court's analysis, the extent of the information collected by the cameras and subsequently retained remains paramount.  Here, although public housing residents are as entitled to safe and secure housing as any private homeowner, they should not be compelled to surrender their right to privacy as a condition of obtaining or residing in stable, safe, and affordable housing.

for any period of time significantly exceeding thirty days.  See generally Compl.  Further, none of the purposes for which the plaintiff alleges the DCHA uses the camera footage—i.e., identifying individuals to arrest or ban from the premises, see id. ¶ 90; "allocat[ing] DCHAPD patrols" based on crime statistics, id. ¶ 100–01; and cooperation with local and federal law enforcement, see id. ¶¶ 91–97—would appear to be served by the defendants' retention of the footage for a period of time significantly longer than thirty days.  Thus, without some indication that the defendants have a policy of retaining the camera footage for extended or indefinite periods of time, or that the defendants' operations necessitate a lengthier retention period, the Court cannot reasonably infer that the defendants have compiled years, or even months, of detailed information about the plaintiff's movements, conduct, and associations.  And, even construing the Complaint in the light most favorable to the plaintiff, as the Court must, the Court concludes that the plaintiff has not alleged that the defendants have collected and retained her information for a period long enough to raise a plausible Fourth Amendment Claim under the mosaic theory, due to the fact that courts have rejected mosaic theory claims based on much longer, more targeted use of cameras, which distinguishes this case from others upon which the plaintiff relies to support her position.  See, e.g., Tuggle, F.4th at 526 (holding that an "eighteen month-duration of the government's pole camera surveillance . . . is concerning, even if permissible").

The Court does not suggest that there are no circumstances in which the high density of surveillance cameras within a housing complex or neighborhood would constitute a search under the mosaic theory.  Indeed, there may be circumstances in which individuals' daily movements may be largely confined to their immediate community rather than an entire city, such that the totality of their movements may be captured within a small geographic area, or circumstances in

37

which the total duration and amount of information collected and retained provide an "intimate window" into an individual's private life and associations. Carpenter, 585 U.S. at 311. Instead, the Court merely concludes that the plaintiff has failed to adequately allege that the defendants' operation of the surveillance camera network in this case violates her reasonable expectation of privacy in her public movements and thus rises to the level of a search under the mosaic theory. Accordingly, the Court must grant the defendants' motion to dismiss Count II.

### 2. The Plaintiff's Common Law Intrusion upon Seclusion Tort Claim (Count III)

The Court next considers the plaintiff's common law intrusion upon seclusion tort claim. The defendants argue, inter alia, that the plaintiff "has failed to allege any facts beyond general speculation that the DHCA has intentionally accessed or viewed her unit." Defs.' Mem. at 21. In response, the plaintiff argues, consistent with her Fourth Amendment claim, that she has adequately pleaded her common law tort claim because she has alleged that the defendants have installed operative cameras throughout Highland Dwellings, including cameras that can view into the interior of her home. See Pl.'s Opp'n at 35.

Invasion of privacy encompasses four distinct torts, see Wolf v. Regardie, 553 A.2d 1213, 1216–17 (D.C. 1989), but the plaintiff only claims an invasion of privacy by "intrusion upon seclusion," Compl. ¶ 193, so the Court need only assess this single theory of liability. An invasion of privacy by intrusion upon seclusion claim requires the pleading of three distinct elements:

> (1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself [or herself], or into his [or her] private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person.

Danai v. Canal Square Assocs., 862 A.2d 395, 400 (D.C. 2004) (alteration in original) (quoting Wolf, 553 A.2d at 1217). Examples of invasions of privacy actionable under this tort include

38

"peeping through windows or other locations in which a plaintiff has chosen to seclude himself [or herself.]" Wolf, 553 A.2d at 1217 (citations omitted).

The Court concludes that the plaintiff has adequately pleaded her intrusion upon seclusion claim. As to the first two elements, the Court has already concluded that the plaintiff has plausibly alleged that the use of surveillance cameras invaded portions of her home not otherwise viewable to the public. See Sec. III.B.1.a. And, the Court similarly concludes that the plaintiff has adequately alleged that it is reasonable to infer at this stage of the case that a reasonable person would be highly offended by the defendants' surveillance. See Garay v. Liriano, 943 F. Supp. 2d 1, 25 (D.D.C. 2013) (noting that "it is axiomatic that any constitutional violation is highly offensive") (quoting Berg v. United States, Civil No. 03-4642, 2007 WL 425448 (MJD/JSM), at *8 (D. Minn. Feb. 2, 2007)). Therefore, because the Court has concluded that the plaintiff has adequately asserted a Fourth Amendment claim at this early stage of the case, it concludes that the plaintiff has also adequately alleged her common law intrusion upon seclusion tort claim. Accordingly, the Court must deny the defendants' motion to dismiss Count III.

### 3. The Plaintiff's Fifth Amendment Claims (Counts IV and V)

The plaintiff contends that the defendants' operation of the surveillance camera system at Highland Dwellings, without affording the plaintiff and other residents an opportunity to be heard on the necessity and scope of the system, violated the Due Process Clause of the Fifth Amendment, which provides that "[n]o person shall . . . be deprived of life, liberty or property without due process of law." U.S. Const. amend. V. Specifically, the plaintiff argues that (1) the defendants' installation and operation of the surveillance cameras without providing her with sufficient information about the cameras or a meaningful opportunity to comment on the surveillance system violates her procedural due process rights, see Compl. ¶¶ 205–20; and (2)

39

the defendants' ongoing surveillance violated her substantive due process rights to "preserve the privacy of her home" and "raise a family free from government surveillance[,]"[14] id. ¶¶ 222–23.

### a. Procedural Due Process Claim

As indicated above, the plaintiff argues that the defendants' installation and operation of the surveillance cameras without providing her with sufficient information or a meaningful opportunity to comment on the surveillance system denied her procedural due process. See Compl. ¶¶ 205–20. Specifically, the plaintiff contends that the defendants' surveillance has violated: (1) her property interests in her continued tenancy in her unit and her right to maintain the integrity of her home against significant changes to her property, such as the installation of surveillance cameras or the physical intrusion on her property allegedly created by the cameras and the associated power boxes, see id. ¶¶ 209–11; and (2) her liberty interests in her right to "freedom of movement" and her interest in her "personally identifying information[,]" id. ¶¶ 212–13. The defendants argue that the plaintiff has failed to allege that "she was actually deprived of any property interest in the unit" because the defendants never in fact evicted her from the property, see Defs.' Mem. at 16, and that they "followed the proper procedures when attempting to enter her rental unit prior to the camera installation on January 31, 2018[,]" id.

"The fundamental requirement of [procedural] due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews, 424 U.S. at 333 (quoting

---

[14] In her opposition, the plaintiff appears to contend that the defendants' surveillance activities also violate her substantive due process rights by infringing on her freedom of expression and association. See Pl.'s Opp'n at 31. However, the Complaint itself does not include any reference to these rights as the basis for her substantive due process claim, see Compl. ¶¶ 221–26, and therefore, the Court will not consider them as the basis for Count V. In any event, as discussed below, even if the Court did consider these rights, the Court would nonetheless dismiss these components of the plaintiff's substantive due process claim, which are subject to the First Amendment's protections and not the Fifth Amendment's substantive due process protections. See Davis v. Billington, 51 F. Supp. 3d 97, 123 (D.D.C. 2014) (concluding that the plaintiff's liberty interest in free speech was governed by the First Amendment and not the Fifth Amendment); Heenan v. Leo, 525 F. Supp. 2d 110, 114 (D.D.C. 2007) (dismissing the plaintiff's due process claim because it was "nothing more than a reiteration of [the] plaintiff's First Amendment claims" and were thus governed by the First Amendment and not the Fifth Amendment).

Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  "Procedural due process rules are meant to

protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life,

liberty, or property."  Carey v. Piphus, 435 U.S. 247, 259 (1978).  "[D]ue process is flexible and

calls for such procedural protections as the particular situation demands."  Morrissey v. Brewer,

408 U.S. 471, 481 (1972).  In resolving claims that an individual's procedural due process rights

have been violated, three factors are considered:

> First, the private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the procedures used, and
> the probable value, if any, of additional or substitute procedural safeguards; and
> finally, the Government's interest, including the function involved and the fiscal
> and administrative burdens that the additional or substitute procedural
> requirement would entail.

Mathews, 424 U.S. at 335.  "A liberty interest may arise from two sources—the due process

clause itself or state law."  Price v. Barry, 53 F.3d 369, 370 (D.C. Cir. 1995).  "For a procedural

due process claim to survive a 12(b)(6) motion, a plaintiff must, at a minimum, 'identify the

process that is due.'"  Gonzalez Boisson v. Pompeo, 459 F. Supp. 3d 7, 17 (D.D.C. 2020)

(quoting Doe v. District of Columbia, 93 F.3d 861, 870 (D.C. Cir. 1996)).  "At bottom, the

process that was constitutionally due will necessarily vary depending upon the nature and

magnitude of the deprivation at issue" as well as "the strength of the [d]efendants' interest in a

given case."  Daskalea v. Wash. Human Soc'y, 275 F.R.D. 346, 361 (D.D.C. 2011) (citing

Mathews, 424 U.S. at 335).

As an initial matter, several of the liberty and property interests originally identified by

the plaintiff as underlying her procedural due process claims appear to be either no longer at

issue or inadequately pleaded in the Complaint.  First, in her opposition to the motion to dismiss,

the plaintiff no longer references her property right as the right to continue living in her home at

Highland Dwellings.  See generally Pl's Opp'n.  Second, she reframes her property right to

41

"maintain the integrity of her home[,]" which "protects against changes to her property—like the installation of cameras[,]" Compl. ¶ 210, as a right to "exclude others from her home[,]" arguing that "[e]ven if [she] tries to cover her windows, she cannot completely protect herself from the intrusion," due to the cameras' purported capabilities, and therefore she "cannot be sure that she is able to protect herself from view just by covering her windows[,]" Pl.'s Opp'n at 25. Thus, because the plaintiff no longer references the physical intrusion on her property or any right to her continued tenancy, the Court concludes that she has conceded the defendants' argument that the Court must dismiss her procedural due process claim to the extent that it is based on: (1) any intrusion by the cameras and associated power boxes on the outside of her unit; or (2) the property right to her continued tenancy, see Tnaib v. Document Tech., Inc., 450 F. Supp. 2d 87, 91 (D.D.C. 2006) ("When a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded." (quoting Fox v. Am. Airlines, Inc., No. 02-cv-2069 (RMU), 2003 WL 21854800, at *2 (D.D.C. Aug. 5, 2003), aff'd, 389 F.3d 1291 (D.C. Cir. 2004))). Further, although the Complaint states that one of the bases for her procedural due process claim is the violation of her freedom of movement, see Compl. ¶ 212, the plaintiff does not mention this basis in her opposition, and thus the Court will treat it as abandoned, see, e.g., Al-Gharawy v. U.S. Dep't of Homeland Sec., 617 F. Supp. 3d 1, 19 (D.D.C. 2022) (noting that the plaintiffs "appear[ed] to abandon [their] claim" by failing to mention it in their opposition). Finally, although the plaintiff in her opposition references her freedom of association, the Complaint does not identify such a right as a basis for her procedural due process claim, see Compl. ¶¶ 210–15 (listing her property and liberty interests), and therefore, the Court need not consider it. In any event, because the Court has already concluded that the plaintiff lacks Article III standing to pursue her First Amendment

42

claim, her procedural due process claim, to the extent it is based on her First Amendment rights, fails as well.

Thus, the Court need only address whether the plaintiff has plausibly stated a procedural due process claim based on her allegations that the defendants' installation of the camera system and the alleged surveillance of her home violated her property right to exclude others from her home, or her liberty interest in her personally identifiable information.  Although the defendants originally argued that the plaintiff's procedural due process claim fails because she was offered an opportunity to voice her disapproval to Highland Dwellings Management at a property meeting in November 2017, see Defs.' Mem. at 18, in their reply to the plaintiff's opposition to their motion to dismiss, the defendants instead argue only that the plaintiff has not adequately established that she was deprived of any liberty or property interest, and thus no process was necessary, see Defs.' Reply at 11–12.  The Court will only address the latter of these arguments because it deems the former to have been abandoned.  See Wal-Mart Stores, Inc., v. Sec'y of Labor, 406 F.3d 731, 736 n.* (D.C. Cir. 2005) (construing the moving party's "silence in reply" as having "abandoned [its initial] argument").  And, because the Court has now concluded that the plaintiff has plausibly alleged that the defendants' cameras capture private areas in her home, the Court similarly concludes that the plaintiff has adequately alleged protected property and liberty interests for the purpose of supporting her procedural due process claim, and that she was owed at least some process, including notice and a hearing before the cameras were installed.  See Mathews, 424 U.S. at 335.  Thus, the Court concludes that it is premature at this stage of the litigation to determine precisely what process was due.  If, with the benefit of discovery, the Court ultimately concludes that the defendants' alleged surveillance does not in fact constitute an unreasonable search under the Fourth Amendment, the Court at that point will conduct its fact-

intensive inquiry into what, if any, process—other than what is required by the Fourth Amendment—was due to the plaintiff under the circumstances.  See Daskalea, 275 F.R.D. at 361.

Accordingly, the Court will grant in part and deny in part the defendants' motion to dismiss Count IV.  Specifically, the Court will grant the defendants' motion to dismiss Count IV to the extent that it seeks to dismiss the components of the plaintiff's procedural due process claim based on the deprivation of her property interest in her continued tenancy in her home; her property interest in maintaining the integrity of her home against significant changes to her property, such as the installation of surveillance cameras or the physical intrusion on her property allegedly created by the cameras and the associated power boxes; and her liberty interests in her freedom of movement and freedom of association.  The Court will deny the defendants' motion to the extent that it seeks to dismiss the components of the plaintiff's procedural due process claim based on her property right to exclude others from her home and her liberty interest in her personally identifiable information.

### b.  Substantive Due Process Claim

The plaintiff also contends that the defendants' operation of the surveillance system at Highland Dwellings violates her substantive due process right to "preserve the privacy of her home" and "raise a family free from government surveillance."  Compl. ¶¶ 222–23.  The defendant argues that the plaintiff has failed to identify any traditionally recognized substantive due process right other than those rights explicitly protected under the Fourth Amendment.  See Defs.' Mem. at 19–20.  In response, the plaintiff argues that she has adequately identified the substantive due process rights that form the bases for her claims, and that these claims "do not

wholly arise under Fourth Amendment doctrine and can also be analyzed under the framework of substantive due process." Pl.'s Opp'n at 30.

The Fifth Amendment provides that no person may "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In reviewing substantive due process claims, the Supreme Court has instructed that there are two features to such a claim. "First, [the Court has] regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" Washington v. Glucksberg, 521 U.S. 702, 720–21 (1997) (internal citations omitted). Second, the Court requires "in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest." Id. (internal citations omitted). Thus, the "[Fifth] Amendment 'forbids the government to infringe [on] . . . 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Id. (internal citations omitted). However, the Supreme Court has also emphasized that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing the claims." Albright v. Oliver, 510 U.S. 266, 273 (1994) (internal quotation marks omitted) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).

The Court therefore concludes that it must dismiss the component of the plaintiff's substantive due process claim arising out of her asserted right to "preserve the privacy of her home[,]" Compl. ¶ 222, because the Fourth Amendment—and not the Fifth Amendment—is the

45

proper constitutional source for her attempt to vindicate that right, see Albright, 510 U.S. at 273 (quoting Graham, 490 U.S. at 395).  As the D.C. Circuit has held, a plaintiff cannot "use the search of her home . . . as grounds for a claim under the Fifth Amendment" because "[t]he remedy for any harm to [the plaintiff resulting] from the search of her home is governed by the Fourth Amendment . . ." Elkins v. District of Columbia, 690 F.3d 554, 562 (D.C. Cir. 2012).

Similarly, the Court concludes that because the plaintiff's substantive due process claim arising from her purported right to "raise a family free from government surveillance[,]" Compl. ¶ 223, takes issue with the same challenged conduct—the defendants' purportedly illegal search of her home—and does not allege that there was some other related conduct that allegedly interfered with her substantive due process rights, this component of her claim must be dismissed, see Albright, 510 U.S. at 273 (quoting Graham 490 U.S. at 395); cf. Doe v. Heck, 327 F.3d 492, 518 n.23 (7th Cir. 2003) (noting that "if a plaintiff's sole purpose in bringing a familial relations claim is to recover damages for a physical seizure, then that claim is more appropriately analyzed under the Fourth Amendment[,]" but, on the other hand, if that claim "specifically alleges that the government's physical seizure coincided with other conduct amounting to an interference with the parent-child relationship[,]" a plaintiff may maintain separate claims). Although the plaintiff relies on a line of Supreme Court jurisprudence holding that parents have a fundamental liberty interest in exercising custody, care, and control of their children, see Pl.'s Opp'n at 32 n.12, these cases relate primarily to the maintenance of the family unit and decisions regarding a child's education and upbringing, and are thus inapposite to the circumstances here. Accordingly, the Court will grant the defendants' motion to dismiss Count V.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part the defendants' supplemental motion to dismiss pursuant to Rule 12(b)(1), and grant in part and deny in part the defendants' motion to dismiss pursuant to Rule 12(b)(6).  Specifically, the defendants' supplemental motion to dismiss pursuant to Rule 12(b)(1) is granted to the extent that it seeks to dismiss the plaintiff's First Amendment claim (Count VI).  The defendants' supplemental motion to dismiss is denied in all other respects.  The defendants' original motion to dismiss pursuant to Rule 12(b)(6) is granted to the extent that it seeks to dismiss: (1) the plaintiff's mosaic theory Fourth Amendment claim (Count II); (2) the components of the plaintiff's procedural due process claim (Count IV) based on the alleged impairment of her freedom of movement and freedom of association, her continued tenancy in her residence, and the physical intrusion allegedly caused by the installation of the power boxes; and (3) the plaintiff's substantive due process claim (Count V).  The motion is denied to the extent that it seeks to dismiss: (1) the plaintiff's Fourth Amendment claim that remains (Count I); (2) the plaintiff's common law intrusion upon seclusion tort claim (Count III); and (3) the components of the plaintiff's procedural due process claim (Count IV) based on her property interest to exclude others from her home and her liberty interest in her private information.

**SO ORDERED** this 31st day of March, 2026.[15]

REGGIE B. WALTON
United States District Judge

---

[15] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.